IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALISHA ROBBINS and AMBER GRANDSTAFF, on behalf of themselves and all others similarly situated, known and unknown, <br><br>         Plaintiffs, <br><br>     v. <br><br> BLAZIN WINGS, INC. d/b/a BUFFALO WILD WINGS <br><br>        Defendant. | Memorandum of Law In Support of Motion for Notice Pursuant to the Fair Labor Standards Act <br><br> Civil Action No. <br> 15-06340 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR STEP ONE NOTICE PURSUANT TO THE FAIR LABOR STANDARDS ACT**

**WERMAN SALAS P.C.**
Douglas M. Werman
Zachary C. Flowerree
77 West Washington Street, Suite 1402
Chicago, Illinois 60602
(312) 419-1008

**THOMAS & SOLOMON LLP**
J. Nelson Thomas
Jessica L. Lukasiewicz
693 East Avenue
Rochester, New York 14607
(585) 272-0540

**LAW OFFICE JAMIE GOLDEN SYPULSKI**
Jamie G. Sypulski
150 North Michigan Avenue, Suite 1000
Chicago, Illinois 60601
(312) 332-6202

*Attorneys for Plaintiffs*

I.       INTRODUCTION

Restaurant servers and bartenders – like Plaintiffs in this case – are among the lowest paid workers in the United States. *See* U.S. Dep't of Labor, Bureau of Labor Stats., *Employment and Wages for the Highest and Lowest Paying Occupations* (Last Modified Date: Mar. 29, 2013) available at http://www.bls.gov/oes/2012/may/high_low_paying.htm, (last accessed Aug. 25, 2015). In fact, bartenders and servers are twice to three times as likely to experience poverty, respectively, as are other American workers. *See* White House Rep't, *The Impact of Raising the Minimum Wage on Women* (March 2014) (last accessed Aug. 25, 2015), available at http://www.whitehouse.gov/sites/default/files/docs/20140325minimumwageandwomenreport final.pdf.  And because women make up 72 percent of workers employed in "predominately tipped occupations," including "restaurant servers" and "bartenders," low wages in the restaurant industry contribute to the gender pay gap. *Id.*

One overlooked factor contributing to servers' and bartenders' impoverished status is a widespread *illegal* practice in the restaurant industry: using employees paid sub-minimum, tip-credit hourly wages to perform excessive amounts of non-tipped job duties, such as general restaurant cleaning and maintenance. This practice harms servers and bartenders by denying them both minimum wage and the opportunity to earn tips, since the non-tipped work they are required to perform has no customer contact. This case seeks to correct this unlawful practice at Defendant's restaurants.

Defendant owns and operates hundreds of Buffalo Wild Wings restaurants across the United States. Plaintiff Robbins worked as a server and Wing Certified Trainer at Defendant's restaurant in Horseheads, New York and as a server and bartender at Defendant's restaurant in

Ithaca, New York.[1] Plaintiff Grandstaff worked as a bartender at Defendant's restaurant in Forest Park, Ohio.[2] Plaintiffs allege that Defendant violated the Fair Labor Standards Act ("FLSA") by failing to pay them minimum wages. In particular, Plaintiffs claim that Defendant pays its tipped employees, including servers and bartenders, sub-minimum, "tip-credit" wages, yet requires them to perform extensive non-tipped job duties with no customer interaction. Since Plaintiffs filed this lawsuit on June 2, 2015, five former employees who worked at Defendant's restaurants in Ohio, Georgia, Arizona, and Texas have opted into this collective action.[3] Because other similarly-situated persons should also be permitted to join this collective action, Plaintiffs seek to send notice of the lawsuit to Defendant's other current and former employees paid tip-credit wages at Defendant's restaurants in the last three years.[4]

## II.    SUPPORTING FACTS

### A.    Defendant Pays its Servers and Bartenders Sub-Minimum Hourly Wages Regardless of the Job Duties It Requires Them to Perform

Except for brief initial training periods, Defendant pays its servers and bartenders sub-minimum hourly wages.[5] Defendant pays its servers and bartenders this way even when it

---

[1]    Ex. A, Robbins Decl., ¶ 2. Note that all Exhibits are attached to the Declaration of Douglas M. Werman, filed herewith.

[2]    Ex. B, Grandstaff Decl., ¶¶ 2, 3.

[3]    Ex. C, Ruter Decl., ¶ 2 (server at Forest Park, Ohio location); Ex. D, Peters Decl., ¶¶ 2-3 (bartender and server at Forest Park, Ohio location); Ex. E, Meza Decl., ¶ 2 (server at Mesa, Arizona location); Ex. F, Jablonski Decl., ¶¶ 2-3 (server, bartender, Wing Certified Trainer, shift lead, and front of house manager at Valdosta, Georgia location); Ex. G, McCoy Decl., ¶ 2 (server and Wing Certified Trainer at Frisco, Texas location).

[4]    Defendant also employs servers and bartenders in states that do not allow payment of sub-minimum, tip-credit wages (*e.g.* California). Plaintiffs do not seek to send notice of the lawsuit to current and former employees of Defendant who worked in those states.

[5]    Ex. A, Robbins Decl., ¶ 3; Ex. B, Grandstaff Decl., ¶ 4; Ex. C, Ruter Decl., ¶ 3; Ex. D, Peters Decl., ¶ 4; Ex. E, Meza Decl., ¶ 3; Ex. F, Jablonski Decl., ¶ 5; Ex. G, McCoy Decl., ¶ 3.

requires them to perform job duties with no customer interaction and that do not generate tips ("Non-Tipped Work").[6]

### B. Defendant Requires its Servers and Bartenders to Perform Extensive Amounts of Non-Tipped Work Every Shift

Every shift, Defendant requires its servers and bartenders to perform Non-Tipped Work.[7] Plaintiffs and the Opt-in Plaintiffs typically spent between 30 and 50 percent of their time during bartending and serving shifts performing Non-Tipped Work.[8] In particular, as recounted below, Defendant requires servers and bartenders to perform opening duties before its restaurants are open, shift-change or closing duties at the end of a shift, cleaning duties based on the shift and day of the week, and other ongoing duties in between serving customers. Defendant maintains published "checklists" at its restaurants detailing many of these duties,[9] and Defendant's management verifies that servers and bartenders complete them each shift[10] and disciplines employees who fail to perform them.[11]

---

[6]     *Id.*

[7]     Ex. A, Robbins Decl., ¶ 5; Ex. B, Grandstaff Decl., ¶ 5; Ex. C, Ruter Decl., ¶ 7; Ex. D, Peters Decl., ¶ 6; Ex. E, Meza Decl., ¶ 6; Ex. F, Jablonski Decl., ¶ 7; Ex. G, McCoy Decl., ¶ 5.

[8]     Ex. A, Robbins Decl., ¶ 14 (40 percent of serving and bartending shifts); Ex. B, Grandstaff Decl., ¶ 20 (40 percent of bartending shifts); Ex. C, Ruter Decl., ¶ 15 (50 percent of serving shifts); Ex. D, Peters Decl., ¶ 19 (40-45 percent of serving and bartending shifts); Ex. E, Meza Decl., ¶ 14 (50 percent of serving shifts; Ex. F, Jablonski Decl., ¶ 21 (30-40 percent of serving and bartending shifts); Ex. G, McCoy Decl., ¶ 14 (50 percent of serving shifts).

[9]     Ex. A, Robbins Decl., ¶ 5 Ex. B, Grandstaff Decl., ¶ 5; Ex. C, Ruter Decl., ¶ 7; Ex. D, Peters Decl., ¶ 6; Ex. E, Meza Decl., ¶ 6; Ex. F, Jablonski Decl., ¶ 7; Ex. G, McCoy Decl., ¶ 5.

[10]    Ex. A, Robbins Decl., ¶ 5; Ex. B, Grandstaff Decl., ¶ 5; Ex. C, Ruter Decl., ¶ 7; Ex. D, Peters Decl., ¶ 6; Ex. E, Meza Decl., ¶ 6; Ex. F, Jablonski Decl., ¶ 7.

[11]    Ex. B, Grandstaff Decl., ¶ 19; Ex. F, Jablonski Decl., ¶ 7.

### 1.       Opening Duties

Servers and bartenders assigned to "open" Defendant's restaurants to prepare for

customers must arrive at least 30 minutes before the restaurants open to customers to perform

"opening duties."[12]   Server opening duties may include:

- retrieving bags of celery, carrots, blue cheese, and ranch dressing from the walk in cooler in the kitchen and distributing them into pans;
- placing chocolate cake slices on plates, wrapping them in plastic, and carrying them to the walk in cooler;
- turning on approximately 50 televisions throughout the restaurant;
- screwing nozzles into the soda machines;
- filling buckets of ice in the kitchen and using them to restock ice bins in the soda machines;
- filling buckets with sanitizer water and soapy water in the kitchen and carrying them to the server stations;
- brewing iced tea;
- reviewing and restocking table caddies with salt and pepper shakers, ketchup, and wet napkins; and
- when the patio is open, bringing buckets of salt, pepper, wet napkins, and menus to the patio, distributing patio chairs so that each table has the correct number, and turning on additional televisions.[13]

Bartender opening duties may include:

- removing approximately 50 stools from on top of tables and placing them underneath;
- carrying bottles of sanitizer spray and rags from the kitchen to the bar;
- situating table caddies in the correct location on tables and replenishing them with salt and pepper or ketchup;
- turning on televisions and "scrambling" them so they are on different stations;
- filling ice bins;
- filling triple sinks in the bar with water and sanitizer;
- removing cone cups from approximately 50 liquor bottles;

---

[12]     Ex. A, Robbins Decl., ¶ 6; Ex. B, Grandstaff Decl., ¶ 7; Ex. C, Ruter Decl., ¶ 8; Ex. D, Peters Decl., ¶¶ 8, 12; Ex. E, Meza Decl., ¶ 8; Ex. F, Jablonski Decl., ¶¶ 10, 14; Ex. G, McCoy Decl., ¶ 7.

[13]     Ex. A, Robbins Decl., ¶ 6; *see also* Ex. C, Ruter Decl., ¶ 8 (listing similar server opening duties); Ex. D, Peters Decl., ¶ 8; Ex. E, Meza Decl., ¶ 8 (same); Ex. F, Jablonski Decl., ¶ 10 (same); Ex. G, McCoy Decl., ¶ 7 (same).

- unpacking shipments of mixes, beer, napkins, stirrers, and straws and writing dates on the mixes and beer; and
- slicing lemons, limes and oranges.[14]

### 2.     Shift Change Duties or "Outs"

At the end of a morning shift, servers and bartenders are required to perform shift change duties, which are sometimes called "outs."[15] Server shift change duties may include: "rolling" silverware, which consists of placing a knife and fork in a paper napkin, rolling it in a particular fashion, and placing an adhesive tab on the end of the napkin to keep it from unrolling; restocking ice; sweeping floors; cleaning tables; restocking additional pans of celery, carrots, blue cheese, and ranch dressing; restocking the server station with napkins, cups, to-go boxes, and other items; and wiping down the salt and pepper shakers, ketchup, and menus in the table caddies.[16] Bartender shift change duties may include: cutting additional fruit; refilling ice; taking trash to bins outside the restaurant and inserting a new trash can liner; draining and refilling triple sinks; restocking straws and napkins; and sweeping.[17]

### 3.     Closing Duties

At the end of an evening shift, servers and bartenders are required to perform "closing"

---

[14]     Ex. B, Grandstaff Decl., ¶ 8; *see also* Ex. D, Peters Decl., ¶ 12 (listing similar bartender opening duties); Ex. F, Jablonski Decl., ¶ 14 (same).

[15]     Ex. A, Robbins Decl., ¶ 7; Ex. B, Grandstaff Decl., ¶ 9; Ex. C, Ruter Decl., ¶ 9; Ex. D, Peters Decl., ¶¶ 9, 13; Ex. E, Meza Decl., ¶ 9; Ex. F, Jablonski Decl., ¶¶ 11, 15; Ex. G, McCoy Decl., ¶ 8.

[16]     Ex. A, Robbins Decl., ¶ 7; *see also* Ex. C, Ruter Decl., ¶ 9 (listing similar server shift change duties); Ex. D, Peters Decl., ¶ 9 Ex. E, Meza Decl., ¶ 9 (same); Ex. F, Jablonski Decl., ¶¶ 11 (same); Ex. G, McCoy Decl., ¶ 8 (same).

[17]     Ex. B, Grandstaff Decl., ¶ 9; *see also* Ex. D, Peters Decl., ¶ 13 (listing similar bartender shift change duties); Ex. F, Jablonski Decl., ¶ 15 (same)

duties, many of which they complete after the restaurants are closed to customers.[18] Server

closing duties may include:

- placing approximately 100 chairs on top of tables;
- vacuuming the dining room;
- mopping the floor from the front door to the bar area;
- restocking ice;
- refilling salt and pepper shakers;
- carrying pans of celery, carrots, blue cheese, and ranch dressing to the walk in cooler;
- turning off televisions;
- unscrewing soda machine nozzles and soaking them in soda water;
- rolling silverware;
- emptying garbage; and,
- when the patio is open, carrying buckets of menus and salt and pepper in from the patio and sweeping the patio.[19]

Bartender closing duties may include:

- sweeping and mopping the floor behind the bar and in the bar stool area;
- transferring fruit from the bar server station to a cooler;
- washing cups or glassware;
- cleaning the bar with soapy water and sanitizer and a cloth;
- plugging draft beer spouts;
- removing the grate over the drains, cleaning it in the kitchen, and replacing it;
- wiping down table caddies and removing them from the bar; and
- removing nozzles from the pop guns and soaking them in soda water.[20]

### 4. Cleaning Duties

In addition to opening, shift change, and closing duties, Defendant's servers and

---

[18]    Ex. A, Robbins Decl., ¶¶ 8, 12; Ex. B, Grandstaff Decl., ¶ 14; Ex. C, Ruter Decl., ¶ 10; Ex. D, Peters Decl., ¶¶ 10, 14; Ex. E, Meza Decl., ¶ 10; Ex. F, Jablonski Decl., ¶¶ 12, 16; Ex. G, McCoy Decl., ¶ 9.

[19]    Ex. A, Robbins Decl., ¶ 8; *see also* Ex. C, Ruter Decl., ¶ 10 (listing similar server closing duties); Ex. D, Peters Decl., ¶ 10 (same); Ex. E, Meza Decl., ¶ 10; Ex. F, Jablonski Decl., ¶ 12; Ex. G, McCoy Decl., ¶ 9 (same).

[20]    Ex. A, Robbins Decl., ¶ 12; *see also* Ex. B, Grandstaff Decl., ¶ 14 (listing similar bartender closing duties); Ex. D, Peters Decl., ¶ 14 (same); Ex. F, Jablonski Decl., ¶ 16 (same).

bartenders are also assigned cleaning duties based on the shift and day of the week.[21] Server

cleaning duties may include:

- scooping ice out of the soda machine ice bin and pouring hot water down the drain;
- pulling booths away from the walls and cleaning the walls and floors;
- scrapping gum off of tables;
- cleaning all chair and table legs;
- dusting approximately 50 televisions;
- cleaning windowsills;
- empting the table caddies and running them through the dishwasher;
- emptying the salt and pepper shakers and running them through the dishwasher; and
- wiping down booster seats and high chairs with a towel and cleaning solution.[22]

Bartender cleaning duties may include:

- scrubbing the tile behind the bar with a long-handled brush;
- removing approximately 100 glasses from the glass chiller, removing any broken glass, removing ice, and cleaning the chiller with a towel;
- soaking approximately 50 liquor bottle pouring spouts and wiping the bottles;
- dusting ledges and pictures with a high duster and swifter duster, which requires climbing on a chair or ladder;
- sweeping and mopping the keg room;
- detailing the dishwasher, which requires draining it, cleaning out fruit seeds, cherry stems, paper, and other items, cleaning the stainless steel, and, if needed, running de-limer through the dishwasher.[23]

**5.    Additional Duties in Between Serving Customers**

Besides completing opening, shift change, closing, and cleaning duties, Defendant's

---

[21]     Ex. B, Grandstaff Decl., ¶ 10; Ex. A, Robbins Decl., ¶ 9; Ex. C, Ruter Decl., ¶ 11; Ex. D, Peters Decl., ¶¶ 11, 15; Ex. E, Meza Decl., ¶ 11; Ex. F, Jablonski Decl., ¶¶ 13, 17; Ex. G, McCoy Decl., ¶ 10.

[22]     Ex. A, Robbins Decl., ¶ 9; *see also* Ex. C, Ruter Decl., ¶ 11 (listing server cleaning duties); Ex. D, Peters Decl., ¶ 11 (same); Ex. E, Meza Decl., ¶ 11; Ex. F, Jablonski Decl., ¶ 13; Ex. G, McCoy Decl., ¶ 10.

[23]     Ex. B, Grandstaff Decl., ¶ 10; *see also* Ex. D, Peters Decl., ¶ 15 (listing bartender cleaning duties); Ex. F, Jablonski Decl., ¶ 17 (same).

servers and bartenders must complete additional Non-Tipped Work in between serving customers.[24] For example, in between serving customers, servers may clear tables, discard uneaten food in the garbage, place dirty silverware and baskets on a tray, carry them to the kitchen (and, at times, run them through the dishwasher), wipe down tables, and sweep.[25] Also in between serving customers, bartenders are responsible for washing all of the restaurant's cups and glassware.[26] Plaintiff Grandstaff spent approximately 30 percent of her shift washing cups and glassware.[27] Bartenders also wipe down tables, sweep, and empty trash in between serving customers.[28]

### 6.     Pre-Shift Meetings

On top of performing extensive Non-Tipped Work, Defendant requires its servers and bartenders to attend pre-shift team meetings.[29] These meetings last between five to twenty minutes, and servers and bartenders are not paid minimum wage to attend them.[30]

---

[24]     Ex. B, Grandstaff Decl., ¶ 11; Ex. A, Robbins Decl., ¶ 10; Ex. C, Ruter Decl., ¶ 13; Ex. D, Peters Decl., ¶¶ 16-17; Ex. E, Meza Decl., ¶ 12; Ex. F, Jablonski Decl., ¶¶ 18-19; Ex. G, McCoy Decl., ¶¶ 11, 12.

[25]     Ex. A, Robbins Decl., ¶ 10; *see also* Ex. B, Grandstaff Decl., ¶ 16 (listing similar server duties); Ex. C, Ruter Decl., ¶ 13 (same); Ex. D, Peters Decl., ¶ 16 (same); Ex. E, Meza Decl., ¶ 12 (same); Ex. F, Jablonski Decl., ¶ 18 (same); Ex. G, McCoy Decl., ¶ 11. (same).

[26]     Ex. B, Grandstaff Decl., ¶ 11; Ex. D, Peters Decl., ¶ 17; Ex. A, Robbins Decl., ¶ 11; Ex. F, Jablonski Decl., ¶ 19; Ex. G, McCoy Decl., ¶ 12.

[27]     Ex. B, Grandstaff Decl., ¶ 11.

[28]     *Id.*; *see also* Ex. D, Peters Decl., ¶ 16 (listing similar bartender duties); Ex. A, Robbins Decl., ¶ 9 (same); Ex. F, Jablonski Decl., ¶ 19 (same).

[29]     Ex. A, Robbins Decl., ¶ 13; Ex. B, Grandstaff Decl., ¶ 18; Ex. C, Ruter Decl., ¶ 14; Ex. D, Peters Decl., at ¶ 18; Ex. E, Meza Decl., ¶ 13; Ex. F, Jablonski Decl., ¶ 20; Ex. G, McCoy Decl., ¶ 13.

[30]     Ex. A, Robbins Decl., ¶ 13 (five minutes); Ex. B, Grandstaff Decl., ¶ 18 (fifteen to twenty minutes); Ex. C, Ruter Decl., ¶ 14 (five to ten minutes); Ex. D, Peters Decl., at ¶ 18 (five

**C.      Defendant Exercises Centralized Control Over its Buffalo Wild Wings Restaurants**

Along with its parent and affiliated companies, Defendant ensures that Buffalo Wild Wings has "consistency throughout [its] concept," including by its "emphasis on . . . employee training in both company-owned and franchised restaurants." *See* Ann. Rep't Pursuant to Sec. 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended Dec. 28, 2014, at 3, available at http://files.shareholder.com/downloads/BWLD/3996064647x0x817353/B5884551-D285-425F-8A0A-E504F82666EC/BWLD_10-K_2014.pdf (accessed Aug. 24, 2015). To that end, Defendant trains its managers through six-week courses at "Certified Training Restaurants," where "manager trainees work in and learn about key aspects of the business" and gain "experience in both hourly and management functions." *Id.* at 7. Defendant also employs Regional Managers to ensure that management at its company-owned restaurants "receive the training and support necessary to effectively operate their restaurants." *Id.* at 6.

One of the Opt-in Plaintiffs in this case, Chandra Jablonski, attended similar management training as a "Team Lead"; the training involved learning specific job duties servers and bartenders were required to perform at Buffalo Wild Wings.[31] Later, as a manager, Ms. Jablonski ensured that servers and bartenders performed their duties on a daily basis, and wrote up employees who failed to perform their opening, closing, or cleaning duties.[32] Also as part of her management training, Ms. Jablonski learned how to use "QSC lists," which managers downloaded from the "corporate website," to divide areas of the restaurant for cleaning,

---

to ten minutes) Ex. E Meza Decl., ¶ 13 (five to ten minutes); Ex. F, Jablonski Decl., ¶ 20 (five minutes).

[31]     Ex. F, Jablonski Decl., ¶ 4.

[32]     *Id.* at ¶¶ 4, 7.

including cleaning by Defendant's servers.[33]   Ms. Jablonski maintained completed QSC lists in

the restaurant's office for one year in case her restaurant was audited by Regional management.[34]

## III.   LEGAL STANDARDS

Motions for step one notice – also referred to as motions for "conditional" or

"preliminary" certification – are "more easily supported" than motions for class certification

under Rule 23, "and are designed to be made ***prior to discovery***." *Hart v. Crab Addison, Inc.*, No.

13-CV-6458 CJS, 2015 WL 365785, at *2 (W.D.N.Y. Jan. 27, 2015) (Siragusa, J.) (emphasis

added). Courts authorize notice when the plaintiffs demonstrate, based on "'pleadings, affidavits,

and declarations,'" that they are "'similarly situated'" to "'employees they seek to notify.'" *Id.*

(quoting *Gordon v. Kaleida Health*, No. 08-CV-378S, 2009 WL 3334784, at *3-4 (W.D.N.Y.

Oct. 14, 2009)). Plaintiffs satisfy their "minimal" evidentiary burden if they present "'a modest

factual showing that they and other putative collective action members together were victims of a

common policy or plan that violated the law.'"[35] *Id.* Plaintiffs can do this by showing that "'there

are other employees who are similarly situated with respect to their job requirements and with

regard to their pay provisions.'" *Hart*, 2015 WL 365785, at *3 (quoting *Myers v. Hertz Corp.*,

624 F.3d 537, 555 (2d Cir. 2010)). Before discovery has taken place, courts do not "apply a

---

[33]      *Id.* at ¶¶ 8-9.

[34]      *Id.* at ¶ 9.

[35]      While this "minimal" showing is sufficient to authorize notice, some courts have held
that even requiring this much is overly exacting in light of the statutory language and policy of
the FLSA. *See Turner v. Chipotle Mex. Grill, Inc.*, No. 1:14-CV-02612-JLK, 2015 WL 4979770,
at *7 (D. Colo. Aug. 21, 2015) ("The proper approach, and the one I apply, is to ***presumptively***
allow workers bringing the same FLSA statutory claim against the same employer to join as a
collective, with the understanding that individuals may be challenged and severed from the
collective if the basis for their joinder proves erroneous") (emphasis added) (citation omitted).

merit-based inquiry" in determining whether to authorize notice.[36] *Gordon*, 2009 WL 3334784, at *7.

## IV.     ARGUMENT

### A.     Defendant Cannot Take a Tip-Credit Against the Minimum Wages of its Servers and Bartenders When it Requires them to Perform Certain Non-Tipped Work or Excessive Amounts of Non-Tipped Work

Restaurants and other employers of tipped employees stand alone among United States businesses in one crucial respect: they routinely pay their employees *less* than the minimum wage. In limited circumstances, restaurants are permitted to pay "tipped employees" less than minimum wage and credit the tips these employees receive from customers against their minimum hourly wages (the so-called "tip credit"). In exchange for this departure from the otherwise invariable obligation to pay employees minimum wage, employers must comply *strictly* with the requirements for taking the tip credit under Section 3(m) of the FLSA.[37]

The first requirement for taking the tip credit is fundamental, yet frequently disregarded by restaurants: an employer can take a tip credit *only* toward the wages of a "tipped employee." A "tipped employee" is a person "*engaged in an occupation* in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t) (emphasis added); *Fast v. Applebee's Int'l, Inc.,* 638 F.3d 872, 876 (8th Cir. 2011). "The tip credit does not apply to just

---

[36]     Courts determine whether plaintiffs are *actually* "similarly situated" to other collective action members at step two, after discovery is complete. *Hart*, 2015 WL 365785, at *3 (citing *Gordon*, 2009 WL 3334784, at *4)).

[37]     *See Chu Chung v. New Silver Palace Rest.,* 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002). Because the FLSA is a remedial statute, an employer who seeks to raise an exception to the minimum wage provisions of the Act bears the burden of proving its entitlement. *Auer v. Robbins*, 519 U.S. 452, 462 (1997). Consequently, an employer bears the burden of establishing its entitlement to the tip credit. *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979).

any employee who ever received a tip . . .  an employee is a tipped employee if two things occur: 1) he is engaged in an occupation, and 2) the occupation is one in which he regularly and customarily receives at least $30 in tips per month. " *Fast*, 638 F.3d at 876 (citing 29 C.F.R. § 203(t)).

An employee is "engaged" in a particular occupation only to the extent that she performs duties consistent with that occupation. *See* 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary *and duties* meet the requirements of the regulations in this part.") (emphasis added); *Mitchell v. Lublin*, 358 U.S. 207, 213 (1959) ("Congress deemed the activities of the individual employees, not those of the employer, the controlling factor in determining the proper application of the Act"); *In re Novartis Wage and Hour Lit.,* 611 F.3d 141, 150-51 (2d Cir. 2010) (whether employee is an outside salesperson depends on salary and duties, not job title). An employee may work for an employer in both a tipped and a non-tipped capacity. 29 C.F.R. § 531.56(e) (providing that an employee may work in "dual jobs").[38] But an employee working in "dual jobs" is a "tipped employee" *only* during the time spent performing work in the tipped position.[39] *Id.*; *Fast,* 638 F.3d at 876; *Driver v. AppleIllinois, LLC*, 890 F. Supp. 2d 1008, 1031-33 (N.D. Ill. 2012). Therefore, when an employee is required to perform non-tipped duties that are *unrelated* to serving customers, such as preparing food, washing dishes, or cleaning the restaurant, that

---

[38]     Department of Labor regulations implementing the FLSA are accorded deference under *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984); *Heitmann v. City of Chi.*, 560 F.3d 642, 646 (7th Cir. Ill. 2009); *Fast*, 638 F.3d at 876.

[39]     Employers are required to maintain records of hours worked by tipped employees in occupations in which they receive tips, as well as hours worked each workday in occupations in which they do not receive tips, and the wages earned for such hours. 29 C.F.R. § 516.28(a)(4), (5).

worker ceases to be a "tipped employee," and the employer must pay that person the *full minimum wage* for time spent performing non-tipped duties. *See Driver v. AppleIllinois, LLC,* 739 F.3d 1073, 1075 (7th Cir. 2014) (where tipped employees perform unrelated non-tipped work, "such as, in the case of restaurant servers, washing dishes, preparing food, mopping the floor, or cleaning bathrooms, they are entitled to the full minimum wage for the time they spend at that work."); *Myers v. The Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999); *Fast,* 638 F.3d at 877. Likewise, an employer must pay an employee full minimum wage if it requires that employee to perform non-tipped work that, though "related" to the employee's tipped occupation – such as occasionally making a pot of coffee – exceeds 20 percent of the employee's overall duties, or those incidental duties are routinely assigned. DOL Field Operations Handbook, § 30d00; *Fast,* 638 F.3d at 877-78, 881.

There is a compelling and undeniable logic to the law: if a tipped employee is not serving or otherwise interacting with the customer, the employee cannot earn a tip; if the employee cannot earn a tip for particular duties, the employer can have no basis for crediting tips against the employee's minimum wages.

### B.     Plaintiffs Have Satisfied the Modest Factual Showing Required to Issue Notice to Defendant's Buffalo Wild Wings Servers and Bartenders Paid Tip-Credit Hourly Wages

Plaintiffs claim that Defendant violated the minimum wage provisions of the FLSA by requiring servers and bartenders paid tip-credit wages to perform duties outside of their tipped occupation. Plaintiffs have supported their claim with seven declarations from Defendant's former servers and bartenders who worked at six of Defendant's locations spread across five states. These declarations demonstrate that Defendant has a policy and practice – reflected in published "checklists" and enforced by management – of paying their servers and bartenders

sub-minimum, tip-credit hourly wages, while requiring them to perform Non-Tipped Work for at least 30 percent of their time worked each shift. *See* Section II.A. of this Memorandum, *supra*. In addition, Defendant exercises centralized control over its restaurants, as evidenced by its training program for restaurant managers. *Id.* at II.C. Further, the declaration from Ms. Jablonski confirms that Defendant trains management on server and bartender job duties and provides management with published QSC lists used to assign additional cleaning tasks. *Id.*

When presented with similar allegations regarding tipped employees performing non-tipped work, this Court and others in the Second Circuit have authorized plaintiffs to issue notice under Section 16(b) of the FLSA. *See Hart*, 2015 WL 365785, at *3 (authorizing notice where the plaintiffs' declarations described "the same unlawful practice" of "requiring tipped workers to perform untipped jobs more than 20% of the time"); *Flood v. Carlson Restaurants Inc.*, No. 14 CIV. 2740 AT, 2015 WL 260436, at *2 (S.D.N.Y. Jan. 20, 2015) (authorizing notice of minimum wage claims, which included allegations of excessive non-tipped "side work," where the plaintiffs submitted six declarations from individuals who worked at eight locations in four states and presented evidence of centralized control over the restaurants). And this Court should do so here.

### C.    This Court Should Adopt Plaintiffs' Proposed Form of Section 16(b) Notice

Plaintiffs ask that the Court approve their proposed notice.  "District Courts have broad discretion in approving the content of proposed notices to class members in FLSA collective actions, with the objective being to provide 'accurate and timely notice concerning the pendency of the collective action, so that an individual receiving the notice can make an informed decision about whether to participate.'" *Hart*, 2015 WL 365785, at *4 (quoting *Valasquez v. Digital Page, Inc.,* No. CV 11–3892(LDW)(AKT), 2014 WL 2048425 at *9 (E.D.N.Y. May 19, 2014)).

Plaintiffs' proposed notice and consent forms, attached as Exhibit H, are virtually identical to the notice and consent forms recently mailed to more than 6,500 tipped employees employed in Michigan, Illinois, Indiana, and Florida by one of Defendant's largest franchisees, Diversified Restaurant Holdings, Inc., in the matters of *Tammy Wolverton v. Diversified Restaurant Holdings, Inc., and Anker, Inc.,* Civil Action Number 2:14-cv-11333-VAR DRG (E.D. Michigan) and *Lisa Murphy and Andre Jordan v. Diversified Restaurant Holdings, Inc., AMC Wings, Inc., AMC Calumet City, Inc., AMC Homewood, Inc., AMC Lansing, Inc., and AMC Lincoln Park, Inc.*, Civil Action Number 1:14-cv-03653 (N.D. Illinois). Plaintiffs' proposed notice is written in simple, easy to understand language, and accurately sets forth the nature of Plaintiffs' claims and the procedural posture of the litigation.

Plaintiffs seek to send notice and consent forms via regular U.S. mail to Defendant's employees paid sub-minimum wages within the last three years. In addition, Plaintiffs seek to require Defendant to post the notice and consent forms prominently near employee time clocks at all its restaurants where employees are paid sub-minimum wages during the 60-day opt in period. *See Sherrill v. Sutherland Global Services, Inc.,* 487 F. Supp. 2d 344, 351 (W.D.N.Y. 2007).

## V.   CONCLUSION

For the forgoing reasons, Plaintiffs request that this Court issue an order:

1.   authorizing the issuance of notice as set forth in Exhibit H to the Declaration of Douglas M. Werman to all current and former employees of Defendant paid sub-minimum wages in the last three years;

2.   requiring Defendant to provide to Plaintiffs' counsel, within 15 days, a list in Microsoft Excel format containing the following information for all persons identified in Section V.1. above: name, last known address, phone number, location of employment, position held, and dates of employment;

3.      requiring Defendant to post notice and consent forms prominently near the employee time clock at Defendant's restaurants in which employees are paid sub-minimum wages during the 60-day opt-in period; and

4.      awarding such other relief as this Court deems just and proper.


Dated: September 9, 2015                         **WERMAN SALAS P.C.**

                                      By:     /s/ Douglas M. Werman_____
                                                One of Plaintiffs' Attorneys