IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALISHA ROBBINS and AMBER GRANDSTAFF, on behalf of themselves and all others similarly situated, known and unknown, <br><br> Plaintiff, <br><br> v. <br><br> BLAZIN WINGS, INC. d/b/a BUFFALO WILD WINGS, <br><br> Defendant. | Memorandum of Law in Opposition to Plaintiffs' Motion for Step One Notice Pursuant to the Fair Labor Standards Act <br><br> Civil Action No. <br> 15-06340 |

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR STEP ONE NOTICE PURSUANT TO THE FAIR LABOR STANDARDS ACT

**FAEGRE BAKER DANIELS LLP**
Andrew B. Murphy (admitted *pro hac vice*)
  *Andrew.Murphy@FaegreBD.com*
2200 Wells Fargo Center
90 South Seven Street
Minneapolis, MN 55402
Telephone: (612) 766-8897

Gregory P. Abrams (admitted *pro hac vice*)
  *Gregory.Abrams@FaegreBD.com*
311 South Wacker Drive, Suite 4300
Chicago, Illinois 60606
Telephone: (312) 212-6500

**HODGSON RUSS LLP**
Paul I. Perlman
  *pperlman@hodgsonruss.com*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone: (716) 848-1479

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................. 1

II.    BACKGROUND .................................................................................. 2

    A.    Plaintiffs allege a uniformity of server and bartender duties within particular restaurants, not across BWW's 465 restaurants ...................................................... 2

    B.    Additional evidence offered by BWW confirms that duties assigned to servers and bartenders vary across 465 restaurants nationwide ......................................... 3

    C.    Though Plaintiffs identify no common policy relating to pay, formal BWW policies specifically require restaurant managers to pay tipped workers at the full minimum hourly wage rate when they perform certain untipped work .......... 5

    D.    Neither the complaint nor the declarations of the named Plaintiffs plausibly suggests any violation of federal law ................................................................... 7

III.    ARGUMENT ....................................................................................... 7

    A.    Though the evidence necessary for conditional certification is modest, the requirement that it suggest putative class members were victims of an unlawful and class-wide policy is not ................................................................. 8

        1. Common but lawful policies do not allow conditional certification .................. 9

        2. Anecdotal evidence of unlawful policies does not allow broad certification .... 9

    B.    Applying the lenient evidentiary standard here, Plaintiffs still fail to provide even minimal evidence of any nationwide policy that violates the FLSA .......... 11

        1. Plaintiffs' "dual jobs" claims are unconnected to any common policy or scheme ................................................................................................... 12

            a. Plaintiffs identify no evidence that BWW requires servers and bartenders to perform uniform duties. ............................................. 12

            b. Plaintiffs identify no evidence that BWW enforces an illegal pay policy contrary to its official policy requiring servers and bartenders performing minimum wage work to receive the minimum wage ...................................... 13

        2. Plaintiffs' "related work" claims are unconnected to any common policy or scheme ................................................................................................ 17

    C.    This court should not expand the scope of conditional certification beyond limits set by this circuit ...................................................................................... 20

IV.    PLAINTIFFS' PROPOSED METHOD AND FORM OF NOTICE IS INAPPROPRIATE ............................................................................... 23

V.    CONCLUSION.................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Adair v. Wisc. Bell, Inc.*,
No. 08-C-280, 2008 WL 4224360 (E.D. Wisc. Sept. 11, 2008) ...............................................21

*Avila v. Northport Car Wash, Inc.*,
No. CV 10-2211 (LDW) (AKT), 2011 WL 833642 (E.D.N.Y. Mar. 10, 2011) ......................24

*Blair v. Equifax Check Servs., Inc.*,
181 F.3d 832 (7th Cir. 1999) .................................................................................................22

*Blakes v. Ill. Bell Tel. Co.*,
No. 11 CV 336, 2011 WL 2446598 (N.D. Ill. June 15, 2011) .................................................25

*Brickey v. Dolgencorp., Inc.*,
272 F.R.D. 344 (W.D.N.Y. 2011) ..................................................................................9, 16, 18

*Chhab v. Darden Rests., Inc.*,
No. 11 Civ. 8345(NRB), 2013 WL 5308004 (S.D.N.Y. Sept. 20, 2013) ................................10

*Damassia v. Duane Reade, Inc.*,
No. 04 Civ. 8819 (GEL), 2006 WL 2853971 (S.D.N.Y. Oct. 5, 2006)...................................10

*Delaney v. Geisha NYC, LLC*,
261 F.R.D. 55 (S.D.N.Y. 2009) .............................................................................................24

*Fasanelli v. Heartland Brewery, Inc.*,
516 F. Supp. 2d 317 (S.D.N.Y. 2007) ...................................................................................10

*Flood v. Carlson Rest. Inc.*,
No. 14 Civ. 2740 (AT), 2015 WL 260436 (S.D.N.Y. Jan. 20, 2015) ...........................14, 17, 18

*Fraticelli v. MSG Holdings, L.P.*,
No. 13 Civ. 6518 (JMF), 2014 WL 1807105 (S.D.N.Y. May 7, 2014).............................21, 23

*Gordon v. Kaleida Health*,
No. 08-CV-378S, 2009 WL 3334784 (W.D.N.Y. Oct. 14, 2009) ...........................................23

*Grant v. Warner Music Grp. Corp.*,
No. 13 Civ. 4449 (PGG), 2014 WL 1918602 (S.D.N.Y. May 13, 2014) ...........................10, 15

*Guillen v. Marshalls of Mass., Inc.*,
750 F. Supp. 2d 469 (S.D.N.Y. 2010) .............................................................8, 11, 13, 15, 16

*Guttentag v. Ruby Tuesday, Inc.*,
  No. 12 CV 3041(HB), 2013 WL 2602521 (S.D.N.Y. June 11, 2013)...............................10, 15

*Hamadou v. Hess Corp.*,
  915 F. Supp. 2d 651 (S.D.N.Y. 2013) ...............................................................................11, 15

*Hart v. Crab Addison, Inc.*,
  No 13-CV-6458CJS, 2015 WL 365785 (W.D.N.Y. Jan. 27, 2015) .........8, 9, 13, 14, 18, 23, 24

*Hoffman-La Roche Inc.*, 493 U.S. 165, 173 (1989)
  493 U.S. 165, 173 (1989).........................................................................................................22

*Hoffmann v. Sbarro, Inc.*,
  982 F. Supp. 249 (S.D.N.Y.1997) ...........................................................................................11

*Ide v. Neighborhood Rest. Partners, LLC*,
  32 F. Supp. 3d 1285, 1294 (N.D. Ga. 2014) ...........................................................................19

*Jenkins v. TJX Cos. Inc.*,
  853 F. Supp. 2d 317 (E.D.N.Y. 2012) ..................................................................................9, 18

*Juarez v. 449 Rest., Inc.*,
  29 F. Supp. 3d 363, 367-68 (S.D.N.Y. 2014) ..........................................................................10

*Laroque v. Domino's Pizza, LLC*,
  557 F. Supp. 2d 346 (E.D.N.Y. 2008) .....................................................................................16

*Levy v. Verizon Info. Servs. Inc.*,
  *Nos*. 06 CV 1583(NG)(SMG), 06 CV 5056(NG)(SMG), 2007 WL 1747104
  (E.D.N.Y. June 11, 2007) ...................................................................................................10, 18

*Lynch v. United Servs. Auto. Ass'n*,
  491 F. Supp. 2d 357 (S.D.N.Y. 2007) ...................................................................................9, 15

*MacPherson v. Firth Rixson Ltd.*,
  No. 12-CV-6162 CJS, 2012 WL 2522881 (W.D.N.Y. June 28, 2012) .....................................23

*Myers v. Hertz Corp.*,
  624 F.3d 537 (2d Cir. 2010) .....................................................................................9, 14, 20, 23

*Raimundi v. Astellas U.S. LLC*,
  No. 10 Civ. 5240 (WHP), 2011 WL 5117030 (S.D.N.Y. Oct. 27, 2011) ...........................10, 15

*Ravenell v. Avis Budget Car Rental, LLC*,
  No. 08-CV-2113 (SLT) (ALC), 2010 WL 2921508 (E.D.N.Y. July 19, 2010).................10, 15

*Roberts v. Apple Sauce, Inc.*,
  945 F. Supp. 2d 995 (N.D. Ind. 2013)................................................................................18, 19

iv

*Rudd v. T.L. Cannon Corp.*,
    No. 3:10-CV-0591, 2011 WL 831446 (N.D.N.Y. Jan. 4, 2011).........................................11, 22

*Schear v. Food Scope Am., Inc.*,
    297 F.R.D. 114 (S.D.N.Y. 2014) ............................................................................................24

*Sharma v. Burberry Ltd.*,
    52 F. Supp. 3d 443, 446, 459 (E.D.N.Y. 2014) .......................................................................11

*Trinidad v. Pret A Manger (USA) Ltd.*,
    962 F. Supp. 2d 545 (S.D.N.Y. 2013) .............................................................................11, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ............................................................................................................16

*Winfield v. Citibank, N.A.*,
    843 F. Supp. 2d 397 (S.D.N.Y. 2012) ...............................................................................10, 15

## OTHER AUTHORITIES

29 C.F.R. § 531.59(b)..........................................................................................................................17

Dep't of Labor Field Ops. Handbook § 30d00(e) (rev. June 30, 2000) ........................................18

## I.      INTRODUCTION

This case is about wages—the alleged failure of Blazin Wings, Inc. ("BWW") to pay former employees Alisha Robbins and Amber Grandstaff minimum wages required under the Fair Labor Standards Act ("FLSA").  Plaintiffs ask this Court to conditionally certify a class of some 58,000 servers and bartenders employed at over 460 restaurants across the country based on that claim.  Yet, Plaintiffs have failed to plead a plausible claim under the FLSA.  The allegations in Plaintiffs' Amended Complaint nowhere account for their variable rates of pay or their higher-than-federally required cash wages.  (*See* Def.'s Mot. to Dismiss Papers, ECF Nos. 24 & 34.)  It is axiomatic that no plaintiff may obtain conditional certification where that plaintiff has not pled a cognizable claim.  But that is what Plaintiffs have sought by this motion.  And for all of the reasons stated in BWW's briefing in support of its motion to dismiss, the Court should not even reach this motion.

Regardless, the absence of allegations supporting underpayment of wages in the Amended Complaint underscores an equally conspicuous absence from Plaintiffs' motion for conditional certification of a nationwide class: evidence of any unlawful wage policy.  To justify inviting thousands of servers and bartenders from across the country into a single lawsuit, Plaintiffs rely almost entirely on checklists.  Seven declarations, they argue, "demonstrate that [BWW] has a policy and practice—*reflected in published 'checklists' and enforced by management*—of paying their servers and bartenders" tip-credit hourly wages when they perform certain "non-tipped" work.  (Pls.' Mem. 14-15, ECF No. 28 (emphasis added).)  This is categorically insufficient.  Even as described by Plaintiffs' declarants, "checklists" specifying server or bartender duties are not uniform across restaurants.  And regardless of what servers and bartenders do, BWW's official policies specifically require that when tipped employees perform minimum wage work (for example, perform tasks unrelated to serving customers) they receive

1

minimum wage hourly pay.  Plaintiffs are contending, in effect, that BWW systematically enforces an illegal pay policy *directly contrary to its official pay policy*; but without class-wide evidence, such theories have never supported grants of broad let alone nationwide conditional certification.  Under the settled law of this circuit, testimony about wages paid to seven out of 58,000 employees is not evidence that BWW's real policy is violating its own official policies and procedures.

Nor is this wholesale evidentiary failure the only flaw in Plaintiffs' request.  Plaintiffs, with one exception, nowhere estimate how much "related work" they perform—a primary basis for alleged class-wide liability.  And, like in their Amended Complaint, nowhere do they account for their variable rates of pay or other states' higher-than-federal minimum cash hourly wages.

In short, what Plaintiffs present as merely routine is a request to extend conditional certification beyond the farthest boundaries ever recognized by this circuit. And lacking any justification, this extraordinary request should be denied.

## II.      BACKGROUND

### A.      Plaintiffs allege a uniformity of server and bartender duties *within particular restaurants*, not across BWW's 465 restaurants.

The named Plaintiffs' "evidence" that they are similarly situated to about 58,000 current and former BWW employees consists almost exclusively of seven declarations from servers and/or bartenders who worked at a handful of the over 460-locations BWW operates in tip credit states.  (*See* Aff. of A. Murphy in Opp'n to Pls.' Mot. ("Murphy Aff.") Ex. B ¶¶ 6-7, filed herewith.)  Addressing their duties, these former employees variously: (1) assert that the restaurants where they worked kept checklists that describe many duties that its servers and bartenders were required to perform every shift; (2) list overlapping but not identical duties associated with different phases of their shifts (*e.g.*, morning server "opening duties"); (3) offer

differing but sizeable estimates of the time required to perform various types of untipped duties (*e.g.*, closing duties or "deep cleaning") during each shift of unspecified length; (4) describe pre-shift meetings lasting from five to twenty minutes; and (5) estimate that the particular server or bartender spent from 30 to 50% of his or her time performing untipped duties (both related and unrelated to their "tipped work").  (*See generally* Werman Dec. Exs. A-G, ECF No. 29-1.)  None, however, asserts that checklists were uniform across restaurants.

As their only additional evidence relating to duties, Plaintiffs point to training generally described in an S.E.C. filing (as including six-week training courses at "Certified Training Restaurants" for managers and involving unspecified oversight by regional managers) and by declarant Chandra Jablonski.  (Pls.' Mem. 10.)  Ms. Jablonski asserts that she was taught specific job duties of servers and bartenders during three weeks of training as a "Team Lead," but identifies no uniform list for either.  (Werman Dec. Ex. F, at 44 ¶ 4.)  Instead, she offers a "QSC list" that recites a variety of quality and maintenance standards, and concedes that managers using that list were "trained to indicate on the QSC list *whether* each item needed to be cleaned and by *whom*."   (*Id.* at 45 ¶ 8 (emphasis added).)

B.     **Additional evidence offered by BWW confirms that duties assigned to servers and bartenders vary across 465 restaurants nationwide.**

Consistent with Plaintiffs' descriptions of restaurant-specific checklists, BWW's submissions confirm that checklists may vary.  Uniform *quality* standards are disseminated in manager training and under the oversight of regional managers; but BWW achieves them through a management structure that grants autonomy to managers charged with operating individual restaurants.  (Murphy Aff. Ex. A ¶ 6.)  BWW also provides advisory checklists to new restaurants, and makes lists accessible as a "non-mandatory" tool on its intranet site; but managers retain discretion over how to assign duties to individual employees.  (*Id.* Ex. A ¶¶ 6-

3

7.)[1]  And across more than 460 restaurants nationwide, the resulting task assignments indisputably vary.  Some managers, for example, assign duties to cooks, cashiers, janitors, other employees paid minimum hourly wages, or even third-party vendors.  (*Id.* Exs. A ¶ 8, E-G, J, K, M, O-Q, S, T, V, X ¶ 6.)  Managers also may limit opening and closing duties to time during which servers and bartenders are paid the full minimum wage, tasks related to tip-producing work, or schedule servers and bartenders to begin work only 15 minutes before restaurants open.  (*Id.* Exs. A ¶ 8, E-G, J, K, M, O-Q, S, T, V ¶¶ 4-6, Ex. X ¶ 6.)  General managers and managers charged with overseeing specific shifts also use a variety of means to regulate the non-tip-producing work performed by bartenders or servers throughout their shifts—means including distributing tasks to minimum wage employees.  (*Id.* Exs. E-G, J, K, M, O-Q, S, T, V ¶¶ 4-6.)[2]

Additional server and bartender declarations—which distinguish between duties performed at different pay rates—reflect these variations.  Time spent by servers and bartenders on particular tasks varies by location and even from shift to shift.  Particularly during busy shifts, for example, some servers spend close to 100% of their time performing tasks that require interaction with customers.  (*Id.* Exs. D, Z ¶ 9, N ¶ 8.)  Others spend between 80 and 95 percent of their time performing tipped duties on related but untipped work.  (*Id.* Exs. C, L, Y, Z, AA ¶ 11, H ¶ 6, I, R, W ¶ 14.)  Servers and bartenders also report spending from 15 to 60 minutes on "opening" and "closing" duties, while others perform few if any duties before their interaction with customers begins.  (*Id.* Exs. C, H, I, W-Y ¶ 6.)

---

[1] Some server and bartender handbooks contain checklists, but provide that actual duties may vary by restaurant and direct servers and bartenders to check with their Wing Certified Trainer or manager—not a BWW mandated policy—regarding their actual duties.  (*Id.* Ex. A ¶ 6.)

[2] General managers report to one of eighty-nine regional managers, who act as intermediaries with the corporate office.  (*Id.* Ex. A ¶ 5.)  For example, they update general managers on policy changes and track the financial performance of restaurants within their regions.  (*Id.*)

      **C.**      **Though Plaintiffs identify no common *policy* relating to pay, formal BWW policies specifically require restaurant managers to pay tipped workers at the full minimum hourly wage rate when they perform certain untipped work.**

      Though asserting that BWW "pays its servers and bartenders sub-minimum hourly wages . . . even when it requires them to perform job duties with no customer interaction and that do not generate tips," (Pls.' Mem. 3-4), Plaintiffs specifically allege only that seven employees at a handful of 465 restaurants were underpaid.  None of these declarants asserts that other employees at the same restaurant were paid less than the FLSA requires.  (*See generally* Werman Dec.)  And notwithstanding that Ms. Jablonski received three weeks of managerial training and three other declarants were "Wing Certified Trainers," none offers information about pay *policies* applying to tipped employees.  (*Id.*)

      In contrast, BWW has provided formal pay policies distributed to the managers of its restaurants. These policies specifically require minimum wage payment of servers and bartenders when they perform work unrelated to those "tipped occupations" or spend substantial time performing related but untipped work.  (Murphy Aff. Ex. B ¶ 9 & Exs. A-D to Ex. B.) Throughout the class period, BWW pay policies have provided that, for example: (1) a "Tipped – Other" job code, which correlates with the federal minimum hourly wage (or any higher state minimum), must be used when a Team Member is required to complete tasks that preclude the potential to earn tips. (*i.e.*, All Team Meetings, opening tasks, closing tasks, etc.) (*id.* Ex. A of Ex. B (Jan 1. 2011 "Tipped – Other" Job Code Policy))[3]; and (2) when paid at the tipped rate, an

---

[3]Similar language appears in the 2013, 2014, and 2015 policies. The 2013 policy, for example, instructs: "Use the 'Tipped – Other' job code when a tipped Team Member is required to complete in-restaurant tasks that do not permit a Team Member to earn tips;" and "Tasks not approved for tipped Team Members include: extensive preparation of dining room/bar area, prepping or portioning of Heart of House foods, mopping floors, deep cleaning of restaurant,

employee is "allowed to work 20% of his/her time on other non-tipped jobs" (2011 policy) or "should only do tasks that also enable the Team Member to take care of Guests' needs" or tasks that enable them to earn tips (2013-2015 policies) (*id.* Exs. A-D of Ex. B).  These mandatory policies are part of a larger group of official policies known as Company Standard Polices, and are both disseminated in manager training sessions and published on the company's intranet page.  (*Id.* Ex. B ¶ 10.)

While managers are required to follow these mandatory pay policies, individual managers are allowed discretion on how work tasks get done within their restaurant and by whom.  Some managers, for example, require that servers and bartenders performing broad "opening" duties and require that they  be "clocked in" at the "Tipped Other" code while doing such work, which requires payment of the minimum hourly wage; other managers rely on employees in minimum wage positions (*e.g.*, cooks, cashiers, or janitors) to perform those duties.  (*Id.* Ex. A ¶ 8.) General managers may also rely on front of house managers, operations general managers, assistant managers, or even "shift leads," to implement such policies on a daily basis.  (*See, e.g.*, *id.*; *id.* Exs. I ¶ 12, M ¶ 4.)

Confirming these practices, declarations by BWW employees from restaurants around the country variously describe manager instructions that servers and bartenders avoid performing significant untipped work and/or to use the minimum wage "tipped other" code for time spent performing those duties or in meetings. (*Id.* Exs. D, L, U ¶ 6, Ex. H ¶¶ 7, 10, Ex. N ¶ 5.) Servers and bartenders also report spending minimal time on "related" work during the time they receive tip-credit, rather than minimum, hourly wages. (*Id.* Exs. C, D, L, AA ¶ 11, Ex. H ¶ 6, Exs. I, R, W ¶ 14, Ex. N ¶ 8, Exs. X, Z ¶ 9.) And many report earning $12 an hour (or more) even when

cleaning bathrooms. If a Team Member must perform any of these tasks at any point during a shift, use the 'Tipped – Other' job code."  (*Id.* Ex. B of Ex. B.)

paid at tip-credit rates, *i.e.*, more than $7.25, the federal minimum hourly wage. (*Id.* Exs. C, D, I, L, R, W, X, Y, Z, AA ¶ 5, Ex. N ¶ 4.)

> **D.     Neither the complaint nor the declarations of the named Plaintiffs plausibly suggests any violation of federal law.**

As explained in BWW's pending motion to dismiss, the factual allegations of named Plaintiffs Alisha Robbins and Amber Grandstaff suggest that they performed work in positions that paid more than the federal minimum wage, and were always paid at a rate that exceeded the minimum cash payment required of tipped employees under the FLSA.  (*See generally* Def.'s Mot. to Dismiss Papers, ECF Nos. 24 & 34.)  Their allegations do not plausibly suggest that Robbins' or Grandstaff's weekly earnings fell below the federal statutory minimum.  (*Id.*)

## III.     ARGUMENT

In their motion for conditional certification and complaint, Plaintiffs advance two theories that some 58,000 former and current employees of BWW are victims of central policies that violate minimum wage requirements under the FLSA:

**First,** Plaintiffs assert that (i) BWW requires all restaurants to pay servers and bartenders tip-credit hourly wages (ii) irrespective of whether they are "perform[ing] non-tipped duties that are unrelated to serving customers" ("unrelated work") (iii) in violation of the FLSA requirement that an employer must compensate all time spent performing unrelated work at "the full minimum wage"—their "dual jobs" claim.  (*See* Pls.' Mem Part II.A.)

**Second,** Plaintiffs contend (i) BWW requires its restaurants to pay tip-credit wages to servers and bartenders (ii) irrespective of what percentage of time they spend performing non-tipped tasks related to their tipped work ("related work") (iii) in violation of the FLSA requirement that an employer pay "the full minimum wage" when employees spend at least 20%

of their time "in the tipped occupation" performing "related work"—their "related work" claim. (*See* Pls.' Mem. Part II.B.)

Neither theory, however, is supported.  There is simply no evidence linking the violations that Plaintiffs allege to any common policy across 465 restaurants nationwide.  Plaintiffs have proposed precisely the sort of "enormous" and "excessive" litigation that Section 216(b) was intended to curtail.

A.   **Though the *evidence* necessary for conditional certification is modest, the requirement that it suggest putative class members were victims of an unlawful and class-wide policy is not**.

In moving for conditional certification, Plaintiffs rely on their "minimal" factual burden—assigning a single page of their brief to explain why this burden has been met across a nationwide class.  (Pls.' Mem. 14-15.)  But while evidence supporting conditional certification may be modest, the requirement that it suggest putative class members were victims of an unlawful and class-wide policy is not.

The certification standards in this circuit are well-developed.  To determine whether a collective action should proceed under the FLSA, courts follow a two-step process.  In the first or "conditional" stage, inquiries focus "not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' under 29 U.S.C. § 216(b) with respect to their allegations that the law has been violated." *Guillen v. Marshalls of Mass., Inc.*, 750 F. Supp. 2d 469, 475 (S.D.N.Y. 2010).  And Plaintiffs' evidentiary burden is concededly low.  Though Plaintiffs must offer more than speculation, the court does not resolve factual disputes, decide the merits of claims, or make determinations about credibility.  *Hart v. Crab Addison, Inc.*, No 13-CV-6458CJS, 2015 WL 365785, at *2 (W.D.N.Y. Jan. 27, 2015).

1.    <u>Common but lawful policies do not allow conditional certification</u>.

What is not low, by contrast, is Plaintiffs' burden to link even modest evidence to a policy that is both unlawful and common across the putative class.  *Id.* (citing *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 (2d Cir. 2010) (plaintiffs must "make a modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law").)  Evidence of a common but *lawful* policy is insufficient.  For example, merely classifying even a nationwide group of employees as exempt—a policy that solely relates to pay—does not provide "the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b)."  *Jenkins v. TJX Cos. Inc*., 853 F. Supp. 2d 317, 323 (E.D.N.Y. 2012) (collecting cases).  To support conditional certification, challenged practices must demonstrate an allegedly unlawful combination of what employees do *and* how they are paid.  *See, e.g.*, *Lynch v. United Servs. Auto. Ass'n*, 491 F. Supp. 2d 357, 369-70 (S.D.N.Y. 2007) (evidence showing special investigators shared job duties and performance standards allegedly incompatible with their exempt pay classification sufficient).

2.    <u>Anecdotal evidence of unlawful policies does not allow broad certification</u>.

Unlawful practices *unlinked to any common policy* also are insufficient to satisfy Plaintiffs' burden.  The question is not whether violations have occurred, but whether putative class members are victims of "a common policy or plan."  *Myers*, 624 F.3d at 555; *Brickey v. Dolgencorp., Inc*., 272 F.R.D. 344, 347 (W.D.N.Y. 2011) (requiring "a single decision, policy or plan ").  And where putative classes are broad, courts generally find evidence of a *class-wide* plan only in two situations: (1) where official or otherwise concededly class-wide policies allegedly violate the FLSA directly; and (2) where such policies are allegedly lawful in theory but necessitate unlawfulness in practice (sometimes called "dual-edged policy" or "de facto"

cases). *See Grant v. Warner Music Grp. Corp.*, No. 13 Civ. 4449 (PGG), 2014 WL 1918602, at

*4-5, *8 (S.D.N.Y. May 13, 2014) (conditional certification where official job descriptions were

identical and a centralized website recited "all internships are unpaid");[4] *Winfield v. Citibank,*

*N.A.*, 843 F. Supp. 2d 397, 405 (S.D.N.Y. 2012) (conditionally certifying "dual-edged" policy

class based on evidence of central policies limiting overtime hours bankers could accrue and

national sales quotas allegedly requiring greater-than-40-hour weeks).[5]  In both, the employer's

own documents or admissions (and not the declarations of putative class members) supply the

primary evidence that violations are common throughout the class.  *See id.*

     The situation is entirely different where plaintiffs merely claim an employer violates its

own policies.  In those cases, courts almost never grant even conditional certification of broadly-

defined classes.[6] And for a simple reason: an employer's documents are seldom available to

show it centrally mandates to *not* do what its policies say, much less to establish outright

---

[4]Numerous courts have granted conditional certification in conceded practices cases. *Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113 (SLT) (ALC), 2010 WL 2921508, at *3-4 (E.D.N.Y. July 19, 2010); *Damassia v. Duane Reade, Inc.*, No. 04 Civ. 8819 (GEL), 2006 WL 2853971, at *5-8 (S.D.N.Y. Oct. 5, 2006); *Raimundi v. Astellas U.S. LLC*, No. 10 Civ. 5240 (WHP), 2011 WL 5117030, at *1 (S.D.N.Y. Oct. 27, 2011).

[5] Examples of courts granting conditional certification in "dual edged" or "de facto" cases where employer practices necessitated alleged FLSA violations are also plentiful, including in the context of tip-credit claims. *See, e.g., Guttentag v. Ruby Tuesday, Inc.*, No. 12 CV 3041(HB), 2013 WL 2602521, at *2 (S.D.N.Y. June 11, 2013); *Levy v. Verizon Info. Servs. Inc.*, *Nos.* 06 CV 1583(NG)(SMG), 06 CV 5056(NG)(SMG), 2007 WL 1747104, at *1-2 (E.D.N.Y. June 11, 2007); *see also Chhab v. Darden Rests., Inc.*, No. 11 Civ. 8345(NRB), 2013 WL 5308004, at *11 (S.D.N.Y. Sept. 20, 2013) (employer followed standardized worklists nation-wide and offered no evidence of any policy requiring minimum wage payment of tipped employees).

[6] The exceptions to this uniformity largely arise when a small number of geographically concentrated locations operate under the same management. *See, e.g., Fasanelli v. Heartland Brewery, Inc.*, 516 F. Supp. 2d 317, 319, 322 (S.D.N.Y. 2007) (restaurants); *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367-68 (S.D.N.Y. 2014) (conditional certification pertaining to three of four restaurants operated by integrated enterprise where plaintiff worked at all three) (collecting cases).

unlawfulness.  *See Guillen*, 750 F. Supp. 2d at 476 (explaining that "attacks" on a formal policy

are "very different" from other kinds of certification requests).  Nor have courts been willing to

extrapolate broadly from individual violations.  When offered to prove what amounts to an

illegal "shadow policy," courts in this circuit treat declarations as evidence *only* of what happens

in particular locations—a rejection of "unsupported assertions" that consistently precludes

conditional certification of any state or nationwide class.  *See, e.g.*, *Guillen,* 750 F. Supp. 2d at

477 (finding evidence sales managers performed "exempt tasks *in contravention of their written*

*job requirements* in nine" clustered stores out of 820 nationwide "little basis to believe that

Guillen is similarly situated to ASMs throughout the country") (emphasis added).[7]

Plaintiffs' evidentiary burden, in sum, is unquestionably more lenient now, at first- rather

than second-stage certification.  But the threshold issue—"whether plaintiffs have demonstrated

that potential class members are 'similarly situated'"—is exactly the same.  *Hoffmann v. Sbarro,*

*Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y.1997).

### B.    Applying the lenient evidentiary standard here, Plaintiffs still fail to provide even minimal evidence of any nationwide policy that violates the FLSA.

Not even minimal evidence suggests that 58,000 servers and bartenders spread across the

country are commonly victims of any unlawful policy here.  Whether for purposes of their "dual

---

[7] Indeed, these courts routinely limit conditional certification to particular locations because, as one court noted, limited declarations pertaining to managers at particular locations do not establish "evidence of a nationwide common policy or plan." *Sharma v. Burberry Ltd.*, 52 F. Supp. 3d 443, 446, 459 (E.D.N.Y. 2014); *see also  Rudd v. T.L. Cannon Corp.*, No. 3:10-CV-0591 (TJM/DEP), 2011 WL 831446, at *8-10  (N.D.N.Y. Jan. 4, 2011) (limiting notice to one store); *Hamadou v. Hess Corp.*, 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) (limiting conditional certification to 25 out of 243 stations); *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 558 (S.D.N.Y. 2013) (limiting conditional certification to 5 of 33 New York City stores where "plaintiffs have not demonstrated across all locations *a uniform policy of failure to pay overtime compensation*") (emphasis added).

jobs" or "related work" claims, Plaintiffs cannot show they are similarly situated across any nationwide class.

     1.     <u>Plaintiffs' "dual jobs" claims are unconnected to any common policy or scheme</u>.

        a.  Plaintiffs identify no evidence that BWW requires servers and bartenders to perform uniform duties.

As reason to certify a nationwide class, Plaintiffs' "dual jobs" theory fails at the outset: there is no evidence that any mandatory policy dictates *what* duties are performed by *which* BWW employees across all locations nationwide.  To claim otherwise, Plaintiffs cite seven declarations from former servers and bartenders that refer to "published checklists."  But they effectively concede these "checklists" are not uniform across all restaurants.[8]  And while Plaintiffs also refer to manager training, offering a declarant (Chandra Jablonski) who trained for three weeks, that evidence only confirms what BWW's own declarations show: the allocation of non-tipped work varies by restaurant.  In particular, the only company-wide list addressed by Jablonski sets quality standards (including, for example, those relating to maintenance of restaurant mechanical systems), not tasks specific to any position.  (Werman Dec. Ex. F ¶ 8; *id.* Ex. A.)  So it remains consistent with BWW's evidence that managers have discretion to delegate "unrelated work" to janitors, cooks, and other untipped employees or third-party vendors.  (Murphy Aff. Ex. B ¶ 8, Exs. E-G, J, K, M, O-Q, S, T, V ¶ 6.)  And according to Ms. Jablonski, managers were "trained to indicate on the QSC list **whether** each item needed to be cleaned and by **whom**"—in other words, BWW did *not* dictate the daily duties of servers or bartenders across the hundreds of restaurants in its nationwide chain.  (Werner Dec. Ex. F ¶ 8) (emphasis added).

---

[8] (Pls.' Mem. 5 (reciting "Bartender cleaning duties *may* include"; "Server cleaning duties *may* include"; and "Server shift change duties *may* include") (emphasis added)).

Checklists, in short, are not corporate mandates. And having failed to identify evidence that mandatory central policies assign the same "unrelated work" to servers or bartenders across 465 restaurants, Plaintiffs are not entitled to conditional certification of a nationwide class. *See Guillen*, 750 F. Supp. 2d at 478, 480 (finding training program failed to suggest common duties where declarants did not say they were instructed "to spend their work hours actually performing [particular] tasks"); *cf. Hart*, 2015 WL 365785, at *3 (finding sufficient evidence of a common policy where declarants asserted they were told by "corporate trainers that they had to complete the untipped work before they could leave the restaurant at the end of each shift").

   b. Plaintiffs identify no evidence that BWW enforces an illegal pay policy *contrary* to its official policy requiring servers and bartenders performing minimum wage work to receive the minimum wage.

But even evidence of uniform server or bartender tasks—had Plaintiffs actually produced any—could not satisfy their minimal burden here. A company-wide policy requiring servers and bartenders to perform standard untipped duties is not unlawful; only by simultaneously limiting their pay to tip-credit wages could BWW's policies even theoretically violate the FLSA. Yet Plaintiffs' assertion that BWW "pays its servers and bartenders sub-minimum hourly wages" is unsupported. Presumably meant to describe a uniform policy across hundreds of restaurants, the statement reflects nothing more than conclusory recitals—that each "was paid less than the minimum hourly wage plus tips"—by just a handful of employees. And those recitals do not address the wages of other employees at the same restaurants. Even Plaintiffs' remaining submission—that BWW provided manager training—is conspicuous for what it omits. Despite the three weeks of managerial training received by one former employee, and declarations by several "Wing Certified Trainers," Plaintiffs identify no official wage policy whatsoever.

What's more, BWW has produced the very pay policies that Plaintiffs' evidence anticipates. BWW has shown that: (1) its formal policies require payment of minimum wage rates when bartenders and servers perform duties that do not generate tips; (2) servers and bartenders across the nation receive minimum wages for performing such duties (*see, e.g.*, Murphy Aff. Exs. B ¶ 9, D ¶ 6; citations at p. 6, *supra*); and (3) while BWW disseminated its mandatory wage policies through training and publication with other mandatory policies, it delegated responsibility for implementing them to restaurant managers. (*Id.* Ex. A ¶ 8.) This is not, in short, a record with *conflicting* evidence relating to an employer's common policies; this is a record with *no* evidence that the employer's common policy violates the FLSA. To conclude from compensation paid to seven former employees that 58,000 tipped employees uniformly received sub-minimum wages for "unrelated work"—and despite formal policies both requiring and enabling payment of minimum wages—is to do what courts even at conditional certification cannot: resort to speculation. *Myers*, 624 F.3d at 555 ("unsupported assertions" do not meet the "modest" factual burden).

Nor do cases relied on by Plaintiffs suggest otherwise. Urging certification, Plaintiffs cite only *Flood* and *Hart*—cases they describe as presenting "similar allegations regarding tipped employees performing non-tipped work." (Pls.' Mem. 15.) But in both, employers opposed certification by contesting (unsuccessfully) direct evidence of common policies relating to *duties*, while making no serious challenge to claims that tipped workers *only* received a sub-minimum wage.[9] In effect, *Flood* and *Hart* merely extend the principle—recognized by other courts

---

[9] In *Hart,* for example, the defendant merely offered an affidavit with the conclusory denial "that there is any corporate policy to pay tipped employees less than the minimum wage." *Hart*, 2015 WL 365785, at *1; *see also Flood*, 2015 WL 260436, at *2 (noting evidence of centralized corporate control over pay and other policies, but identifying no evidence of any policy requiring minimum wage payment of tipped workers when their "related" duties exceed 20%).

addressing "dual-edged" policies—that plaintiffs can meet their burden with evidence that lawful

class-wide policies necessitate unlawful practices. *Cf. Winfield*, 843 F. Supp. 2d at 397 (granting

conditional certification where meeting centrally-imposed sales quotas allegedly required

overtime but central policies limited overtime pay). And *Flood's* examples of certification on

"comparable or thinner records"—cases like *Guttentag*, *Raimundi*, *Lynch*, and *Grant*—rest on

direct evidence or admissions of central policies *dictating both duties and pay*. (*See supra* p. 9-

10 & n.4-5); *see also Ravenell v. Avis Budget Car Rental, LLC*, No. 08-CV-2113 (SLT) (ALC),

2010 WL 2921508, at *2 (E.D.N.Y. July 19, 2010) (observing courts are particularly likely to

find certification appropriate "where defendants have admitted that the actions challenged by

plaintiffs reflect a company-wide policy").

Here, in contrast, Plaintiffs are attacking BWW's formal wage policy—alleging a

nationwide policy of *not* following BWW's official policy to pay tipped workers performing

non-tipped work the full minimum wage. And for obvious reasons—that is, because the

employer has not conceded any such policy—this allegation of a "shadow policy" presents a

fundamentally different evidentiary burden. *See Guillen*, 750 F. Supp. 2d at 476 (explaining that

"attack[s] on a common formal policy" are "very different" than other theories of class-wide

injury). Whereas even small numbers of declarations can connect lawful policies to unlawful

consequences, Plaintiffs are offering seven declarations here—in the context of a nationwide

putative class—to establish the challenged policy itself. And courts in this circuit reject such

speculation. In cases such as this, courts have repeatedly denied requests for conditional

certification of any state- or nationwide class, and instead limited conditional certification to

those locations where the declarants worked. *See Hamadou v. Hess Corp.,* 915 F. Supp. 2d 651,

666 (S.D.N.Y. 2013) (noting courts' repeated denials of "conditional certification of a statewide

class (or a nationwide class) where plaintiffs have alleged that a *de facto* unlawful policy exists, but have only presented facts pertinent to several locations in a particular region"); (*see supra* p. 11 n.7).

Plaintiffs' request for nationwide certification also overlooks the discretion delegated to managers at individual restaurants. Denying conditional certification of a putative nationwide action on behalf of exempt assistant sales managers, another court explained:

> It is undisputed that the Marshalls stores *are overseen by multiple "[d]istrict" and "[r]egional [m]anagers."* Thus, the fact that ASMs were responsible for performing non-exempt tasks in contravention of their written job requirements in nine stores in a particular metropolitan area, out of 820 stores nationwide, provides little basis to believe that Guillen is similarly situated to ASMs throughout the country with respect to his claim regarding ASM job responsibilities.

*Guillen*, 750 F. Supp. 2d at 477 (emphasis added). Yet there is still less basis for extrapolation on this record. BWW's lawful pay policies were implemented by restaurants' managers. (Murphy Aff. Ex. A ¶ 8, Exs. E-G, J, K, M, O-Q, S, T, V ¶ 4.) So violations of mandatory pay policies in *some* restaurants do not establish violations in *others*—as BWW's supplemental declarations confirm. (*See id.*; *supra* p. 11 n.7); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2554 (2011) ("Wal–Mart's 'policy' of *allowing discretion* by local supervisors over employment matters . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action") (emphasis in original).[10]

Plaintiffs' "dual jobs" theory, in sum, suggests no basis for conditional certification of a nationwide class. The "existence of a formal [lawful] policy" does not "immunize" an employer

---

[10] *See also Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying nationwide conditional certification); *Laroque v. Domino's Pizza, LLC*, 557 F. Supp. 2d 346, 355 (E.D.N.Y. 2008) (finding allegations of off-the-clock work at one store did not make the three plaintiffs "similarly situated to individuals who worked at a number of different locations, and under a number of different managers").

from liability or conditional certification;[11] but it does require Plaintiffs to do more than speculate that BWW disseminated an unlawful, shadow policy through hundreds of restaurants where no declarant ever worked.

2.   Plaintiffs' "related work" claims are unconnected to any common policy or scheme.

For the same reasons, Plaintiffs fail to connect their "related work" theory—allegations that BWW's corporate policies require tipped workers to spend more than 20% of their "tipped occupation" time on related (but untipped) work at sub-minimum wages—to any company-wide policy or plan.  This remains a pay case without an unlawful pay policy: Plaintiffs focus almost exclusively on checklists; but formal BWW policies require restaurants to pay minimum wages to tipped workers who perform minimum wage work.  (Murphy Aff. Ex. B ¶ 9.)  And declarations about pay practices affecting seven servers and bartenders are not evidence the company enforces an illegal "shadow policy" against the other 58,000.  Nor does Plaintiffs' evidence suggest 58,000 employees performed the *same* duties across more than 460 restaurants.

Plaintiffs' evidence also fails for an even more basic reason: only one of the declarants asserts, even in conclusory terms, that she spent more than 20% of her time performing tipped-related work *while otherwise working in a tipped occupation*.[12]  Under the FLSA, an employer may take a tip credit "only for hours worked by [an] employee in an occupation in which [he] qualifies as a 'tipped employee.'" 29 C.F.R. § 531.59(b); the 20% rule therefore applies only to

---

[11] When *Flood* rejected this principle in cases where "plaintiffs have presented evidence that this policy was commonly violated in practice," it cited dual-edged policy cases where individual plaintiffs merely confirmed that common policies proven by other evidence had an unlawful effect.  *Flood*, 2015 WL 260436, at *4.

[12] Specifically, Grandstaff asserts that she spent 30% of her shift washing glassware (without apportioning that time between hours spent in a tipped and untipped "occupation").  (Werman Dec. Ex. B ¶ 11).  She worked at, among other locations, the Forest Park, Ohio location, which is now closed. (Murphy Aff. Ex. B ¶ 8.)

17

time spent performing tipped and related work, not to time spent on unrelated work  (*i.e.*, time spent outside a tipped occupation).  Dep't of Labor Field Ops. Handbook § 30d00(e) (rev. June 30, 2000).  But while these declarants allegedly performed both related and unrelated work, their time estimates do not (with one exception) distinguish between the two.  Instead, most declarants merely recite that they spent some percentage of their time performing untipped work—an allegation that does not describe any FLSA violation.  *Roberts v. Apple Sauce, Inc.*, 945 F. Supp. 2d 995, 1004 (N.D. Ind. 2013).  Putting all other inadequacies aside, Plaintiffs request notice to 58,000 putative class members based on the testimony of a single server.

This is a bridge too far.  Even evidence that BWW *both* imposed uniform duties on bartenders and servers *and* uniformly paid only tip-credit wages would merely identify lawful policies; certification would still require evidence that these lawful policies produce an unlawful (or "dual-edged") and nationwide effect.  *See, e.g.*, *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y.  2011) (declining "to hold that facially-lawful policies . . . can form the equivalent of a 'common policy or plan that violate[s] the law,' merely because they *indirectly* might encourage the minimization of overtime") (emphasis in original).  And under the law of this circuit, the account of one plaintiff or declarant does not qualify.  *Compare Jenkins v. TJX Cos. Inc.*, 853 F. Supp. 2d 317, 324 (E.D.N.Y. 2012) (finding plaintiff's deposition testimony insufficient to support conditional certification despite evidence of uniform job duties and exempt classification of store managers), *with Levy v. Verizon Info. Servs. Inc.*, Nos. 06 CV 1583(NG) (SMG), 06 CV 5056 (NG) (SMG), 2007 WL 1747104, at *4 (E.D.N.Y. June 11, 2007) (noting allegations by 22 plaintiffs and one declarant), *Hart*, 2015 WL 365785, at *3 (noting 21 affidavits from employees spread across 16 restaurants), *and Flood*, 2015 WL 260436, at *2 (noting six declarations across eight restaurants).  Though Plaintiffs note some

jurisdictions "presumptively" allow workers bringing the same claims against the same employer to proceed collectively, the Second Circuit has rejected this standard. (*See* Pls.' Mem. 11 n.35 (citing single District of Colorado case adopting a lower permissive joinder standard).)

The experiences of these declarants should also be considered within the context of consistent evidence from other sources. Declarations submitted by BWW show that servers and bartenders working at tip-credit rates perform varying amounts of related work *within* the 20% limit. (Murphy Aff. Exs. C, D, L, AA ¶ 11, Ex. H ¶ 6, Exs. I, R, W ¶ 14, Ex. N ¶ 8, Exs. X, Z ¶ 9.) BWW has also shown that restaurant general managers restrict untipped work through a variety of means, including assigning untipped work to minimum wage employees (like cashiers, cooks, and janitorial staff) and third-party vendors. (*Id.* Exs. E-G, J, K, M, O-Q, S, T, V, X ¶ 6.) And the efficiency of individual workers inevitably varies. Given the sensitivity and "complexity" of the underlying rule, *Roberts*, 945 F. Supp. 2d at 1004, evidence that different restaurants use *different* checklists, use *different* kinds of workers to perform checklist tasks, make *different* adjustments for fluctuating business, and employ workers with *differing* levels of efficiency defeats any possible basis for extrapolating from one server and one bartender to another 58,000. *See generally Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1294 (N.D. Ga. 2014) (observing that "sidework checklists do not establish the length of time Defendants' tip credit employees actually spent doing non-tip related work"). What is speculation in every other context does not become evidence merely because Plaintiffs request conditional certification.

Plaintiffs, in sum, offer no evidence that BWW's corporate policies require servers and bartenders to spend more than 20% of their "tipped occupation" time on related work, much less that an illegal "shadow policy" requires paying them sub-minimum wages. Because putative

class members across 465 restaurants are not "victims of a common policy or plan that violated the law," conditional certification must be denied.  *Myers*, 624 F.3d at 554–55.

### C.     This court should not expand the scope of conditional certification beyond limits set by this circuit.

Even as a matter of discretion, this court should deny Plaintiffs' request for conditional certification.  What Plaintiffs present as run-of-the-mill request is extraordinary—and not just because it would reach 465 restaurants and 58,000 current and former employees.  If certified, this class would push well beyond the farthest boundaries of conditional certification in this circuit: here, unlike cases involving dual-edged policies, there is no evidence of formal or admitted policies that allegedly necessitate unlawful practices; here, unlike cases recognizing illegal "shadow policies," there is no evidence that individual declarants have personal knowledge of what happens throughout the entire class; and here, unlike *Flood,* there is no evidence of a corporate support center that *enforces* company-wide policies and practices, much less any evidence that BWW enforces a policy directly contrary to its official policy governing pay.  Add to that a failure by all but one declarant to allege (even in conclusory terms) that related work occupied more than 20% of her "tipped work" time and nationwide conditional certification becomes more novel and less warranted still.

And beyond these flaws, Plaintiffs have requested nationwide certification though they—and most likely every other putative plaintiff in their jurisdictions—make no plausible claim under the FLSA.  As explained in BWW's pending motion to dismiss, the higher minimum wages (for tipped and untipped work) dictated by New York and other state laws all but certainly eliminate claims by putative class members in those states.  (Def.'s Mem. of Law in Supp. of Mot. to Dismiss Pls.' First Am. Class & Coll. Action Compl. ("Def.'s Mot. to Dismiss") 11-12, ECF No. 24; Def.'s Reply Mem. of Law in Supp. of Its Mot. to Dismiss ("Def.'s Reply") 5-6,

20

ECF No. 34.)  Plaintiff Robbins, for example, earned only $2.25 *less* than the federal minimum

wage when she received New York tip-credit wages; and she earned $2.87 *more* than the federal

"tip-credit" wage when she performed tipped work.  So even if she and other New York class

members spent 30-50% of their total time on untipped work—precisely as Plaintiffs have

alleged—there would be no adequate factual basis for inferring any FLSA violation.  A similar

analysis applies to Plaintiff Grandstaff.  (*See* Def.'s Mot. to Dismiss 4, 11-12; Def.'s Reply 5-8.)

Further, servers and bartenders who, like Plaintiffs, earned higher-than-tip-credit wages

performing other weekly roles may lack any minimum wage claims for that reason too.  (Def.'s

Mot. to Dismiss 12; Def.'s Reply 5-8.)  At the very least, these variable pay rates[13] confirm that

assessing liability will require individualized, workweek-by-workweek evaluations of pay

records to determine if an employee's compensation fell below the minimum wage.  (*See*

*generally* Def.'s Mot. to Dismiss 7-10 (discussing *Klinghoffer* workweek averaging principle);

Def.'s Reply 5-8 (same)); *Fraticelli v. MSG Holdings, L.P.*, No. 13 Civ. 6518 (JMF), 2014 WL

1807105, at *1-2 (S.D.N.Y. May 7, 2014) (denying conditional certification when liability could

vary across different departments).

      Nor is it any answer that Plaintiffs' request for overbroad notice may be rectified by

second-stage decertification.  It would waste "time and resources to notify a large and diverse

class only to later determine that … class members are not similarly situated."  *Adair v. Wisc.*

*Bell, Inc.*, No. 08-C-280, 2008 WL 4224360, at *4 (E.D. Wisc. Sept. 11, 2008).  And conditional

---

[13] Plaintiffs' Amended Complaint and supporting declarations underscore the variability of pay
rates.  (*See, e.g.*, First Am. Class & Coll. Action Compl & Demand for Jury Trial ("Am.
Compl.") ¶¶ 36-37, ECF No. 21 (Plaintiff Robbins worked as a cook and hostess earning "at
least" the full minimum wage); Werman Dec. Ex. F ¶ 3 (acknowledging various jobs, including
bartender, server, Wing Certified Trainer, Shift and Team Lead, and Front of House Manager,
but providing no information on rates of pay for those positions); *id.* Ex. G ¶ 3 (acknowledging
work as Wing Certified Trainer, but failing to specify wage rate).)

certification of enormous classes can impose the same disproportionate costs as class

certification under Rule 23. As Judge Posner has written: "a grant of class status can put

considerable pressure on the defendant to settle, even when the plaintiff's probability of success

on the merits is slight." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834 (7th Cir. 1999). It

was (in part) such enormous litigation, in fact, that led Congress to enact Section 216(b)—

amendments that do less to *invite* representative litigation than restrain it. *See Hoffman-La*

*Roche Inc.*, 493 U.S. 165, 173 (1989) (noting Congress reacted to the "excessive litigation

spawned by plaintiffs lacking a personal interest in the outcome"). The unintended

consequences of mass-actions, in turn, have led courts in this circuit to urge a "measured

approach when addressing a request for collective action certification . . . *involving a large and*

*broadly defined collective group of plaintiffs*." *See Rudd v. T.L. Cannon Corp.*, No. 3:10-CV-

0591 (TJM/DEP), 2011 WL 831446, at *6 (N.D.N.Y. Jan. 4, 2011) (emphasis added).

Here, moreover, there are no benefits to offset these costs. The "court's discretionary

power to facilitate the sending of notice to potential class members" is merely a "tool of efficient

case management;" yet there is nothing efficient about gathering potentially thousands of class

members into one lawsuit *without any evidence they are similarly situated to the named*

*plaintiffs*. *Trinidad v. Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 556 (S.D.N.Y. 2013).

Nor is efficiency served by collecting these plaintiffs in a jurisdiction where few if any residents

can state a plausible claim. *See generally id.* (noting efficient case management is not served by

giving notice to "potential class members where the representative plaintiffs have failed to state

plausible FLSA violations."). Though functioning "to determine *whether* similarly situated

plaintiffs do in fact exist," conditional certification does not allow what plaintiffs request: court-

supervised notice to thousands of employees almost certainly *not* similarly situated to the named

plaintiffs.  *See, e.g.*, *Fraticelli*, 2014 WL 1807105, at *3 (clarifying that "the standard to be

applied *in the first instance* . . . is whether Plaintiffs have made 'a modest factual showing'" class

members were "victims of a common policy or plan that violated the law") (emphasis added).

For all these reasons, this court should decline Plaintiffs' request to lower the threshold

for conditional certification.  Where, as here, the only evidence of a central policy is evidence of

a *lawful* policy, such enormous litigation remains outside the scope of Section 216(b).  *Myers*,

624 F.3d at 555 (explaining plaintiffs must offer evidence that putative class members "were

victims of a common policy or plan *that violated the law*") (emphasis added).

## IV.     PLAINTIFFS' PROPOSED METHOD AND FORM OF NOTICE IS INAPPROPRIATE.

If the Court grants conditional certification, it should reject several aspects of Plaintiffs'

proposed method for disseminating notice and the content of their proposed notice and consent

form. To start, the Court should not require Defendant to post notice and consent forms at all

implicated locations.  (Pls.' Mem. 16.)  Although this Court has previously approved posted

notice, *see Hart*, 2015 WL 365785, at *4, several courts have not, particularly where Plaintiffs

have not even asserted that mailing notice is insufficient.  *See, e.g.*, *Gordon v. Kaleida Health*,

No. 08-CV-378S, 2009 WL 3334784, at *11 (W.D.N.Y. Oct. 14, 2009) (denying request for

posted notice as premature and noting how posting only reaches current employees, who have an

interest in providing their employer up-to-date mailing addresses).

Plaintiffs' counsel also is not entitled to putative class members' phone numbers in their

request for contact information.  (Pls.' Mem. 16); *see MacPherson v. Firth Rixson Ltd.*, No. 12-

CV-6162 CJS, 2012 WL 2522881, at *5 (W.D.N.Y. June 28, 2012) (denying plaintiffs' request

for telephone numbers due to privacy reasons).[14] As to the content of Plaintiffs' proposed notice, Defendant has proposed revisions in Murphy Affidavit Exhibit BB, including:

- The "What is the lawsuit about?" section also should include Defendant's position on Plaintiffs' allegations.  Although this Court did not agree in *Hart*, 2015 WL 365785, at *4-5, several courts have required such language.  *See e.g.*, *Delaney v. Geisha NYC, LLC*, 261 F.R.D. 55, 59 (S.D.N.Y. 2009); *Schear v. Food Scope Am., Inc.*, 297 F.R.D. 114, 128 (S.D.N.Y. 2014).

- The "What happens if I join the lawsuit?" section (Werman Dec. Ex. H at 2 ¶ 6), neglects to explain the obligations that a class member may incur, such as being subject to responding to discovery, giving depositions, and testifying at trial.  *See Avila v. Northport Car Wash, Inc.*, No. CV 10-2211 (LDW) (AKT), 2011 WL 833642, at *5 (E.D.N.Y. Mar. 10, 2011).

- Similarly, the "Who will be my lawyers if I join the lawsuit, and how will the lawyers be paid" section (Werman Dec. Ex. H at 2 ¶ 9) should advise that the individual could be partially responsible for Defendant's costs if Defendant prevails. *See e.g.*, *Hart*, 2015 WL 365785, at *4.

Finally, Plaintiffs' proposed consent form is deficient. First, this lawsuit is brought exclusively against corporate-owned stores.  (Am. Compl. 2 n.1.)  Defendant has acquired various franchisee-owned stores during the class period, and thus opt-ins may have worked for both franchised-owned store and corporate entities.  Thus, the consent form's reference to "parents, subsidiary or affiliated companies" might mislead a potential opt-in into concluding that his or her time spent at a franchise store (if any) is encompassed in this case.  The consent form must be clear that only time spent working at corporate-owned stores is at issue so that the individual can make a more fully informed assessment of the choice to opt-in.

---

[14] In *Hart*, this Court rejected defendant's argument that it need not disclose *any* contact information to plaintiffs' counsel and thus was not presented with any contention against disclosing telephone numbers specifically. *See Hart*, 2015 WL 365785, at *4-5.

Second, the consent form is inaccurate in referencing an individual not being paid "all minimum wages owed to me" without clarifying that it is *because* of payment of a tipped credit rate.  It should clarify that this suit does not involve minimum wage claims for reasons *other* than alleged misapplication of the tipped credit rate, such as working off-the-clock or paycheck errors.  *See e.g.*, *Blakes v. Ill. Bell Tel. Co.*, No. 11 CV 336, 2011 WL 2446598, at *8 (N.D. Ill. June 15, 2011) (limiting notice to claims at issue, not "any possible FLSA claim under the sun").  Defendant has revised the consent form accordingly.

## V.   CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Conditional Certification.

Dated: October 30, 2015          **FAEGRE BAKER DANIELS LLP**

S/Andrew B. Murphy
Andrew B. Murphy (admitted *pro hac vice*)
  *Andrew.Murphy@FaegreBD.com*
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-8897
Facsimile: (612) 766-1600

Gregory P. Abrams (admitted *pro hac vice*)
  *Gregory.Abrams@FaegreBD.com*
311 South Wacker Drive, Suite 4300
Chicago, Illinois 60606
Telephone: (312) 212-6500
Facsimile: (312) 212-6501

**HODGSON RUSS LLP**

Paul I. Perlman
  *pperlman@hodgsonruss.com*
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
Telephone: (716) 848-1479
Facsimile: (716) 819-4616

25

**ATTORNEYS FOR DEFENDANT
BLAZIN WINGS, INC. d/b/a
BUFFALO WILD WINGS**