UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| ALISHA ROBBINS, et al., | | |
| | Plaintiffs, | DECISION AND ORDER |
| -vs- | | |
| | | 15-CV-6340 CJS |
| BLAZIN WINGS, INC. d/b/a BUFFALO WILD WINGS, | | |
| | Defendant. | |

_____

APPEARANCES

| | |
|---|---|
| For Plaintiffs: | Douglas M. Werman, Esq. |
| | Zachary C. Flowerree, Esq. |
| | Werman Salas P.C. |
| | 77 W. Washington Street, Suite 1402 |
| | Chicago, Il 60602 |
| | |
| | Jessica L. Lukasiewicz, Esq. |
| | Thomas & Solomon LLP |
| | 693 East Avenue |
| | Rochester, NY 14607 |
| For Defendants: | Andrew B. Murphy, Esq. |
| | Faegre Baker Daniels LLP |
| | 2200 Wells Fargo Center |
| | 90 South Seventh Street |
| | Minneapolis, MN 55402 |
| | |
| | Gregory P. Abrams, Esq. |
| | Faegre Baker Daniels LLP |
| | 311 S. Wacker Drive, Suite 4400 |
| | Chicago, Il 60606 |

INTRODUCTION

This is an action asserting minimum-wage claims under the Fair Labor Standards Act ("FLSA") and New York Labor Law. Plaintiffs are tipped employees (servers and/or bartenders) who worked at Buffalo Wild Wings ("BWW") restaurants. Plaintiffs maintain that Defendant paid them at the tip-credit rate, but required them to perform either un-tipped "dual jobs" duties or an excessive amount of un-tipped "related duties." *See*, 29 U.S.C. § 531.56(e). Now before the Court is Plaintiff's motion (Docket No. [#27]) for conditional certification of a nationwide FLSA collective action, to provide notice to all of BWW's current and former tip-credit employees over the past three years. The application is granted.

BACKGROUND

Plaintiffs worked primarily as servers and bartenders at various BWW restaurant locations. With regard to their work as servers and bartenders, Plaintiffs were classified as tipped employees, and BWW paid them at the tip-credit rate. However, Plaintiffs maintain that BWW violated the FLSA by requiring them to perform two categories of non-tip-producing work, for which they should have been paid at the regular minimum wage rate, rather than at the tip-credit rate. First, Plaintiffs allege that Defendant made them perform "non-tipped work that [was] unrelated to their tipped occupation, such as sweeping, mopping and vacuuming restaurant floors, preparing food, including slicing fruit, rolling silverware, and washing the restaurant's dishes."[1] Plaintiffs maintain that such unrelated work amounted to a "dual job," within the meaning of 29 C.F.R. § 531.56(e). Second, Plaintiffs allege that Defendant made them perform an excessive amount of non-tipped work that was related to

---

[1]Second Amended Complaint [#55] at ¶ 6.

their occupation as servers/bartenders.[2] Plaintiffs do not identify such alleged "related un-tipped" tasks, apart from stating that they involved "no customer interaction" and "did not generate tips."[3] Nevertheless, Plaintiffs contend that to the extent the untipped work was "related" to their tipped occupations and took up more than twenty percent of their workweeks, it exceeded the extent of "related duties" permitted by 29 C.F.R. § 531.56(e).

Plaintiffs generally maintain that the non-tip-producing work that they performed falls into five categories: 1) "opening duties"; 2) "morning shift-out" duties; 3) "closing duties"; 4) "additional cleaning duties"; and 5) "team meetings." "Opening duties" consisted of tasks such as taking down chairs from tables, filling bucks with sanitizer and water, filling table caddies with condiments, filling ice bins, turning on televisions, slicing fruit, putting nozzles on soda machines, brewing iced tea and opening patio umbrellas. "Morning shift-out" duties included tasks such as re-stocking server stations, rolling silverware, re-filling buckets with sanitizer and water, brewing more tea, sweeping, clearing tables and taking out trash. "Closing duties" consisted of tasks such as taking out trash, carrying dirty dishes to the kitchen, rolling silverware, sweeping, vacuuming, re-filling ice bins, cleaning soda machine nozzles, putting chairs up on tables, turning off televisions and lowering patio umbrellas. "Additional cleaning duties" consisted of tasks such as scraping chewing gum from the bottoms of tables, cleaning tables and chairs, sweeping, mopping, dusting, cleaning

---

[2] Second Amended Complaint [#55] at ¶ 5.

[3] Second Amended Complaint [#55] at ¶ 39. Plaintiffs list a variety of specific tasks throughout the Second Amended Complaint, but, although they identify a number of those tasks as being unrelated to their tipped jobs, they do not clearly specify which of the tasks listed in the pleading constitute *related* un-tipped work.

condiment caddies, washing glasses, and cleaning soda machines.[4]  "Team meetings" were pre-shift meetings of managers and co-workers.

In support of the motion for preliminary certification of a nationwide class, Plaintiffs submitted affidavits from seven former BWW employees: Alisha Robbins ("Robbins"), Amber Grandstaff ("Grandstaff"), Dylan Ruter ("Ruter"), Amanda Peters ("Peters"), Adrienne Meza ("Meza"), Chandra Jablonski ("Jablonski") and Tim McCoy ("McCoy").  Robbins worked as a server at BWW's site in Horseheads, New York, and as a bartender at the Ithaca, New York, site, between 2012 and 2013.  Grandstaff worked as server and bartender at BWW's sites in Norwood, Ohio, and Colerain, Ohio, between 2005 and 2014.  Ruter worked as a server at BWW's site in Forest Park, Ohio, during 2013.  Peters worked as a server and bartender at BWW's site in Forest Park, Ohio, between 2008 and 2012.  Meza worked as a server at BWW's site in Mesa, Arizona, for approximately eight months during 2012.  Jablonski worked as a server, bartender and front-of-house manager at BWW's site in Valdosta, Georgia, between 2011 and 2015.  McCoy worked as a server at BWW's site in Frisco, Texas, between 2010 and 2013.

These seven affiants all generally indicate that in addition to taking customer orders and serving food and drinks, they were required to perform the five categories of non-tip producing work discussed above.  Robbins states, for example, that at the Ithaca, New York, site, closing duties usually took about one hour per shift, and additional cleaning duties usually took forty-five minutes per shift.  Grandstaff indicates that at the Forest Park, Ohio,

---

[4]It appears that both opening duties and morning shift-out duties were performed when an employee was assigned an opening shift; closing duties were performed when an employee was assigned a closing shift; and additional cleaning duties could be performed during any type of shift.

and Colerain, Ohio, locations, opening duties usually took about an hour to complete, morning shift-out duties took between thirty minutes and sixty minutes per shift to complete, closing duties took at least one hour per shift to complete, and additional duties took between thirty minutes and one hour per shift to complete. Ruter indicates that opening duties, closing duties, and additional cleaning duties *each* took him between one and two hours per shift to complete. Peters generally does not specify how long it took her to complete the various non-tip-producing tasks. Meza indicates that opening duties, morning shift-out duties, closing duties, and additional cleaning duties *each* took about one hour or more, per shift, to complete. Jablonski indicates that when she worked as a bartender, opening duties took about one hour per shift to complete, and closing duties and additional cleaning duties each took between one hour and two hours, per shift, to complete. Jablonski indicates that when she worked as a server, opening and morning shift-out duties each took about thirty minutes per shift to complete, while closing duties took about one hour per shift to complete. The affiants all indicate that they were paid at the tip-credit rate when performing the aforementioned non-tip producing work.

Significantly, for purposes of the instant motion, Plaintiffs maintain that BWW's practice of requiring servers and bartenders to perform such non-tipped work was company-wide, because the same practice occurred at multiple BWW locations, and because managers selected the various non-tip-producing tasks to be performed from checklists provided to managers by BWW.

In opposition to Plaintiffs' motion for conditional certification, Defendants submitted, *inter alia*, affidavits from twenty-seven individuals, some of whom are BWW executives and some of whom are servers and bartenders.

BWW generally indicates that at "all relevant times" it has maintained official policies requiring that tipped employees be paid at the minimum-wage rate, and not the tip-credit rate, when they perform either unrelated non-tip-producing tasks, or related non-tip-producing tasks for a substantial period. BWW indicates that such policies are "mandatory across all restaurant locations." On this point, the centerpiece of Defendants' submission is an affidavit[5] from Joy Wolney ("Wolney"), who, in her capacity as BWW's Director of Employee Relations and Human Resource Implementation, has overseen BWW's human resource functions since 2010. Wolney indicates that BWW currently owns 558 restaurants in 36 states.[6] Wolney indicates that BWW has employed approximately 58,461 servers or bartenders who were paid at least in part at the tip-credit rate over the past three years. Wolney further states:

> At all relevant times, BWW has maintained official pay policies that it distributes to all General Managers of its restaurants. These policies specifically require (and enable) minimum wage payment of servers and bartenders when they perform work unrelated to those 'tipped occupations' or spend substantial time performing related but untipped work.
>
> ***
>
> BWW's pay policies are part of a larger group of official policies known as Company Standard Policies and are mandatory across all restaurant locations. They are disseminated to General Managers, provided in manager training sessions, and published on the company's intranet page, which remains available to restaurant managers at all times.

(Docket No. [#36-1] at p. 8, ¶ ¶ 9-10.

---

[5]Docket No. [#36-1] at pp. 7-24. Wolney also indicates that the Forest Park, Ohio, BWW location, where Grandstaff, Ruter and Peters worked, was closed in 2014.

[6]However, Wolney indicates that "approximately 93" of those restaurants are located in the states of California, Minnesota, Nevada or Washington, where during the past three years BWW has not employed servers or bartenders at the tip credit rate. Plaintiffs agree that they are not seeking to have notice sent to servers and bartenders in those states. *See*, Pl. Memo of Law [#28] at p. 3, n. 4.

Attached to Wolney's affidavit are the written policies to which she refers. More specifically, Exhibit A to Wolney's affidavit is "Policy/Procedure # CSP 07.30," entitled "'Tipped-Other' Job Code," and dated January 31, 2011. Exhibit B to Wolney's affidavit is a document entitled "Tipped Other," which is dated October 14, 2013. Exhibit C to Wolney's affidavit, which is apparently a revised version of Exhibit B, is entitled "Tipped Other" and is dated May 26, 2014. Exhibit D to Wolney's affidavit, which is apparently a revised version of Exhibit C, is entitled "Tipped Other" and is dated July 22, 2015. All of these documents discuss procedures for ensuring that tipped employees are paid at least minimum wage when performing certain kinds of non-tip-producing work, in compliance with the FLSA. For example, in pertinent part, Exhibit A to Wolney's affidavit states:

> Under the Fair Labor Standards Act (FLSA) a "tipped" Team Member (Server and Bartender) is someone who regularly receives more than $30.00 per month in tips.
> ***
> A Team Member cannot be paid less than your state's minimum wage for hours worked when they are unable to earn tips.
> ***
> "Tipped-Other" job code is to be used when a Team Member is required to complete tasks within the restaurant that prohibits the potential for them to earn tips. (i.e.: All Team Meetings, opening tasks, closing tasks, etc...)
> ***
> A Tipped Team Member is allowed to work 20% of his/her time on other non-tipped jobs.
> ***
> It is highly recommended that all side work cleaning duties are completed by the Team Member during their shift. These tasks are part of the Server and Bartender responsibilities during their scheduled shift.

Exhibit A also describes specific procedures for "clocking-in" tipped employees at the "Tipped Other" rate when they are performing non-tipped jobs.

The Court observes that Exhibit A appears to instruct managers that tipped employees may perform "cleaning duties" or "other non-tipped jobs" at the tip-credit rate, provided that such duties do not take more than twenty percent of the employee's time, without regard to whether such duties would be considered "related" to the employee's regular tipped position. In other words, Exhibit A appears to indicate that a manager could assign a bartender to perform tasks not usually associated with bartending, such as cleaning a restroom or "deep cleaning" a restaurant booth, provided that they would not take the bartender more than twenty percent of his time to complete.

On the other hand, Exhibits B,C, and D, which were adopted later, appear to differentiate between side-work tasks that are related to serving and bartending, and certain unrelated tasks. For example, Exhibit B indicates that tipped employees should never perform certain tasks, regardless of the amount of time involved, unless they are clocked in at the "Tipped Other" rate:

> Tasks not approved for tipped Team Members include: extensive preparation of dining room/bar area, prepping or portioning of Heart of House foods, mopping floors, deep cleaning of restaurant, cleaning bathrooms. If a Team Member must perform any of these tasks at any point during a shift, use the "Tipped-Other" job code.

Docket No. [#36-1] at p. 15. However, even with such language, Exhibits B,C and D still appear to envision that servers and bartenders will perform other un-tipped "opening tasks," "closing tasks" and "cleaning duties," for up to fifteen minutes at a time, at the tip-credit rate, without specifying whether such tasks are "related" or "unrelated."

As mentioned earlier, Plaintiffs' affiants indicate that managers at their restaurants used pre-printed BWW task checklists when assigning non-tip-producing jobs to servers and

bartenders, and Plaintiffs suggest that such fact indicates that BWW had a policy of requiring servers and bartenders to perform non-tip-producing work. However, Defendants deny that the existence of such task checklists is any evidence of such a policy. In that regard, Defendants indicate that while BWW makes such checklists available to managers, it does not require that they be used. *See*, Amaris Affidavit, Docket No. [#36-1] at p. 3 ("BWW does not centrally mandate that servers and bartenders perform the same tasks across its corporate restaurants. It does make certain cleaning checklists available to managers under the 'non-mandatory' tools section of BWW's intranet, which managers may review at their discretion."). Defendants further maintain that the checklists are not evidence of a policy to use servers and bartenders to perform untipped work, because the checklists do not indicate who should perform the work. Instead, BWW restaurant managers have discretion as to whom they assign to perform particular tasks on the checklists, provided that if a tipped employee is assigned to do un-tipped jobs he will be clocked in at the "Tipped Other" rate, consistent with the policies discussed above.[7]

Additionally, Defendants have submitted so-called "happy camper affidavits" from current employees, attesting that BWW's actual practices are contrary to what Plaintiffs maintain. For example, Jacob Adaway ("Adaway"), who works as a server and bartender at BWW's restaurant in Lufkin, Texas, indicates that he never performs related untipped work more than twenty percent of the time, and that when he performs un-related cleaning work he is paid at a separate minimum-wage rate, not the tip-credit rate. Similarly, Matthew

---

[7] *See*, Amaris Aff. [#36-1] at p. 4, ¶ 8; *see also*, Wolney Aff. [#36-1] at p. 8, ¶ ¶ 9-10.

Bartelson ("Bartelson"), the manager of BWW's restaurant in Watertown, New York, states in pertinent part:

> As General Manager at the Watertown, New York restaurant, I implement BWW's "Tipped-Other" procedure. I have instructed my staff on how to clock in and clock out for purposes of recording their time. In accordance with the "Tipped Other" procedure, when not performing duties for which they receive tips (other than small amounts of work related to serving customers, such as clearing or setting a table or rolling silverware), servers and bartenders are expected to be clocked in under the "Tipped Other" code, which ensures they are paid the minimum wage for that work.

Docket No. [#36-1] at p. 38, ¶ 4; see also, Affidavit of Edward Coconato, Docket No. [#36-1] at pp. 53-53, ¶ 7 ("As a tipped employee, my manager instructed me on how to clock in and clock [out] for purposes of recording my time using Aloha, the system we use for clocking in and for orders. My manager told me that when the first table is sat, that I am to log in using the 'Server' code. My manager also told me that when I am performing opening duties, I must clock in using the 'Tipped Other' code, which I understand ensures that I am paid the minimum wage (or more) for that work. I use Tipped Other when completing my opening tasks.").[8]

In reply, Plaintiffs have submitted additional affidavits from three BWW servers indicating, in pertinent part, that at the particular restaurants in which they worked (Scottsdale, Arizona, Goodyear Arizona, and Knoxville, Tennessee, respectively), they were

---

[8]The Court observes that Coconato's affidavit appears to be inconsistent with Exhibit D to Wolney's affidavit, which purportedly governs BWW's procedures at the present time. More specifically, Coconato indicates that he was instructed to clock in using the "Tipped Other" code whenever he performs opening duties, while Exhibit D indicates that employees use the "Tipped Other" code only when the opening duties will take more than fifteen minutes to perform.

not instructed to use the "Tipped Other" code when performing non-tip-producing tasks.[9] Plaintiffs also maintain that the written policies which Defendants have submitted actually *establish* that BWW committed tip-credit violations. For example, Plaintiffs contend that the policy attached as Exhibit A to Wolney's affidavit instructs managers to use tip-credit-rate servers and bartenders to perform cleaning tasks *unrelated* to the servers' or bartenders' occupations. Further, Plaintiffs argue that Defendants are mistaken in suggesting that in order for Plaintiffs to satisfy their burden, they must identify an actual formal corporate policy that violates the FLSA:

> To satisfy the 'lenient' burden for step one notice, the plaintiffs need make only a modest factual showing that they and the other putative collection action members together were the victims of a common policy *or plan* that violated the law. While the term 'policy' may suggest a concrete written procedure, the interchangeable use of [the word] 'plan' -- or, by other courts, 'practice' -- makes clear something less formal and specific is sufficient.

Pl. Reply Memo at p. 6, Docket No. [#47] at p. 7 (citation omitted, emphasis in original).

Defendants also dispute certain aspects of Plaintiffs' proposed notice form, which the Court will discuss further below.

On December 10, 2015, counsel for the parties appeared before the undersigned for oral argument.

---

[9]Docket No. [#47], Exhibits A-C.

11

DISCUSSION

<u>The Request for Preliminary Certification of an FLSA Collective Action</u>

Unlike class certification motions under Rule 23, motions for preliminary certification of FLSA collective actions are more easily supported, and are designed to be made prior to discovery.

> A majority of district courts, including those within the Second Circuit, employ a two-step process to determine whether a lawsuit should proceed as an FLSA collective action.
>
> At the first step—the notice stage—the court determines, based on the pleadings, affidavits, and declarations, whether the named plaintiffs have demonstrated that the employees they seek to notify are "similarly situated." The evidentiary standard is lenient at this stage, the plaintiffs need make only a modest factual showing that they and the other putative collective action members together were victims of a common policy or plan that violated the law.  A plaintiff's burden on this step is minimal, especially since the determination that potential plaintiffs are similarly situated is merely a preliminary one.
>
> The second step occurs after discovery is complete, when the court examines the evidentiary record and makes a factual finding as to whether the conditionally certified plaintiffs are, in fact, similarly situated to the lead plaintiffs. If the court determines the opt-in plaintiffs are not similarly situated, the court will decertify the class, the claims of the opt-in plaintiffs will be dismissed without prejudice, and the class representatives may proceed to trial on their individual claims.  Alternatively, if the class description is shown to require modification, that can be accomplished at the second tier inquiry.

*Gordon v. Kaleida Health*, No. 08–CV–378S, 2009 WL 3334784 at *3-4 (W.D.N.Y. Oct. 14, 2009) (citations, internal quotation marks and footnote omitted); *see also, Myers v. Hertz Corp.*, 624 F.3d 537, 554-555 (2d Cir. 2010) (Indicating that while the two-step process

described above is "not required by the terms of the FLSA or the Supreme Court's cases," it is nonetheless "sensible.").

At the conditional-certification stage, plaintiffs may demonstrate that they and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law,"

> by making some showing that there are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions . . . . The modest factual showing cannot be satisfied simply by unsupported assertions, but it should remain a low standard of proof because the purpose of this first stage is merely to determine whether similarly situated plaintiffs do in fact exist.

*Myers v. Hertz Corp.*, 624 F.3d at 555. "[A]t this first stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations[, and a]ccordingly, an FLSA collective action may be conditionally certified upon even a single plaintiff's affidavit." *Escobar v. Motorino E. Vill. Inc.*, No. 14 CIV. 6760 KPF, 2015 WL 4726871 at *2 (S.D.N.Y. Aug. 10, 2015) (citations and internal quotation marks omitted); *see also, id.* ("Defendants oppose conditional certification largely by attacking the credibility of the declarants or by offering contradictory factual assertions, including by the declaration of Motorino's general manager [and] . . . payroll records, but such evidence still goes to the merits rather than the propriety of conditional certification and notice[.]") (citation and footnote omitted).

In the instant case, Defendants acknowledge that Plaintiffs' "evidentiary burden [on this motion] is concededly low," but nevertheless maintain that Plaintiffs have failed to satisfy it, since they have not shown that BWW had a "common [unlawful] policy or plan" with

regard to the alleged FLSA violations. Defendants assert, in that regard, that "[t]here is simply no evidence linking the violations that Plaintiffs allege to any common policy across 465 restaurants nationwide."[10] To the contrary, Defendants point to BWW's written policies and procedures as evidence that BWW's corporate policy is to avoid the type of FLSA tip-credit violations that Plaintiffs are alleging. Defendants essentially argue that such policies and procedures require the Court to deny Plaintiff's motion for conditional certification, since Plaintiff has at most shown "individual violations," from which the Court should not "extrapolate broadly."[11]

However, the Court disagrees and finds that Plaintiffs have met the low threshold required for conditional certification. More specifically, Plaintiffs' supporting affidavits, from servers and bartenders who have worked in eleven different BWW restaurants in five states, and which are quite consistent in their descriptions of the non-tip-producing tasks that the affiants were regularly required to perform, suggest that there "are other employees who are similarly situated with respect to their job requirements and with regard to their pay provisions." As for Defendants' submissions, while the Court may not necessarily agree with

---

[10] Def. Memo of Law [#35] at p. 14.

[11] Def. Memo of Law [#35] at p. 11. In that regard, Defendants cite cases such as *Guillen v. Marshalls of MA, Inc.*, 750 F.Supp.2d 469 (S.D.N.Y. 2010) ("*Guillen*") and *Sharma v. Burberry Ltd.*, 52 F.Supp.3d 443 (E.D.N.Y. 2014) ("*Sharma*"). However, *Guillen* is factually inapposite, since it involved a motion to conditionally certify a nationwide FLSA class against a retail clothing chain, based only on affidavits from five individuals, whose knowledge of the defendant's store operations was limited to the New York City area. The court in *Guillen* denied the application to certify a nationwide class, since the plaintiffs' proof pertained to such a limited geographic area. *Id.*, 750 F.Supp.2d at 478-479. The instant case is much different, since Plaintiffs have submitted affidavits from BWW employees at eleven different restaurants in six different states (Arizona, Georgia, New York, Ohio, Tennessee and Texas). *Sharma* is similarly distinguishable from the instant case, since in that case the court denied a motion for conditional certification of a nationwide class because the plaintiffs provided only "unsupported assertions" about the defendant's overtime practices at stores located outside of New York and New Jersey. *Id.*, 52 F.Supp.3d at 459-460; *see also, Rudd v. T.L. Cannon Corp.*, 2011 WL 831446 at *3-10 (N.D.N.Y. Jan. 4, 2011) (Denying conditional certification of a state-wide FLSA class, and granting conditional certification only as to potential claimants who worked in the same restaurant as the plaintiffs).

Plaintiffs that BWW's written policies prove that it violated the FLSA, the Court believes that there are issues of fact as to whether such policies are entirely consistent with the FLSA. The Court also agrees with Plaintiffs that Defendants' submissions are really more directed at the merits of Plaintiffs' claims, which the Court may not consider on a motion for conditional certification. Accordingly, Plaintiff's application [#27] for conditional certification is granted.

### *The Form of the Notice To Be Sent and the Method of Distribution*

Defendants initially raised various objections to Plaintiffs' proposed form and methods of notice. Subsequently, in Plaintiff's reply [#47] and in correspondence submitted by Plaintiffs and Defendants[12] after oral argument, the parties agreed to resolve most of Defendants' objections. However, Defendants still maintain that the Court should order Plaintiffs to make the following changes to the proposed form notice: 1) the notice form should warn potential opt-in plaintiffs that they may be required to participate in discovery and/or testify at trial; 2) the notice should warn potential opt-in plaintiffs that they may be partially responsible for Defendants' costs if Defendant prevails; and 3) the form notice should clarify that Plaintiffs' claims involve only tip-credit claims, and not other types of minimum-wage claims. Plaintiffs oppose the first two demands because they contend that it is unlikely that in a class this large, any individual opt-in plaintiff would be required to personally participate in discovery or trial, or that any such plaintiff would be responsible for any significant dollar amount of costs if Defendants prevailed. Plaintiffs therefore maintain that adding such language would accomplish nothing, except to possibly scare off potential

---

[12]*See*, January 14, 2016, letter from Douglas Werman, Esq. and January 28, 2016, letter from Gregory Abrams, Esq.

plaintiffs. Plaintiffs also oppose the third objection, since they maintain that the proposed notice already clearly indicates that this action involves only tip-credit claims.

District Courts have broad discretion in approving the content of proposed notices to class members in FLSA collective actions, with the objective being to provide "accurate and timely notice concerning the pendency of the collective action, so that an individual receiving the notice can make an informed decision about whether to participate." *Valasquez v. Digital Page, Inc.*, No. CV 11–3892(LDW)(AKT), 2014 WL 2048425 at *9 (E.D.N.Y. May 19, 2014) (citations and internal quotation marks omitted).

At the outset, the Court agrees with Plaintiffs that the proposed notice adequately explains that this action involves tip-credit claims by servers and bartenders, as opposed to other types of minimum-wage claims.[13] Accordingly, Defendants' objection on that point is denied. However, the Court agrees with Defendants' other two objections. Indeed, as currently drafted, the proposed notice is somewhat misleading because it gives absolutely no notice to potential opt in plaintiffs that they could be required to participate in the litigation, or that they could be responsible for a portion of Defendants' costs if Plaintiffs' are unsuccessful. For example, by stating, "If the servers and bartenders lose the lawsuit, you will not receive any money. . . . If the servers and bartenders lose the lawsuit, you will not have to pay your lawyers," the proposed notice incorrectly makes it seem that those are the only possibilities.[14] Accordingly, for purposes of accuracy paragraphs six and nine of the proposed notice shall be supplemented as follows: At the end of paragraph six, entitled,

---

[13] *See*, Docket No. [29-1] at p. 62, ¶ 2.

[14] *See*, Docket No. [29-1] at p. 63, ¶ ¶ 6, 9.

"What happens if I join the lawsuit?," the following language shall be added: "Either way, you may be required to participate in pre-trial discovery, such as depositions, or to testify at a trial or hearing."; and the last sentence of paragraph nine, entitled "Who will be my lawyers if I join the lawsuit, and how will the lawyers be paid?," shall read, "If the servers and bartenders lose the lawsuit, you will not have to pay your lawyers, though you may be required to pay a pro-rata share of Defendants' costs in defending the lawsuit."  The Court does not believe that either of these minor changes will unfairly deter potential class members from opting-in to the action.

## CONCLUSION

Plaintiff's motion for conditional certification [#27] is granted, except that the proposed notice shall be amended as indicated above and as per the parties' out-of-court stipulations.

SO ORDERED.

Dated:   Rochester, New York
         March 18, 2016

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge